JOURNAL ENTRY AND OPINION
Defendant Charles A. Troupe appeals from his conviction for aggravated murder. For the reasons set forth below, we affirm.
On September 17, 1998, defendant and co-defendant William Allen were indicted for aggravated murder in connection with the October 1994 murder of Tina Kirkpatrick. Defendant was subsequently granted a separate trial which commenced on January 11, 1999.
For its key evidence, the state presented the testimony of Cleveland Police Officer Kevin Carter, Dwayne and Gilbert Bybee, Mabel Kirkpatrick, Las Vegas Police Lieutenant Frank Sutton, retired Cleveland Police Detective Edward Gray, deputy coroner Robert Challener, Don Laster, Durand Banner, Dwayne Walker, Ernest Evans, and F.B.I. Agents James Finch, Stephen Vogt, and James Hartnett.
Cleveland Police Officer Kevin Carter testified that while on routine patrol on October 18, 1994, he received a report that there was a body in a field near East 100th Street and Superior Avenue. Carter went to the area and found the body, later identified as Tina Kirkpatrick, naked from the waist up and with blood about the nose and mouth.
Dwayne Bybee testified that his brother Gilbert Bybee was Tina's boyfriend. Tina periodically stayed with Gilbert and Dwayne at their grandmother's house. Dwayne last saw Tina on Sunday, October 16, 1994, when defendant picked her up from Bybee's grandmother's house at around 7:00 p.m. They left in defendant's sister's car and Tina was not under the influence of drugs at this time. Later that evening, defendant called, and informed them that he had dropped Tina off at East 131st Street and Corlett.
On cross-examination, Dwayne admitted that he had been incarcerated simultaneously on state and federal charges and is presently on probation but he denied receiving any kind of consideration in exchange for his testimony.
Tina's mother, Mabel Kirkpatrick, testified that Tina had a cocaine problem. She did not use heroin and that she was afraid of needles. Tina had gotten into trouble in Las Vegas, and after this, she was avoiding defendant and would not take his calls.
Lt. Frank Sutton of the Las Vegas Metropolitan Police Department testified that he is part of an organized crime unit which investigates suspected large scale drug activity involving at least ten kilograms. In June 1994, the unit began to investigate a group of individuals from Cleveland which included defendant. Michael Evans of this group approached undercover members of the police unit to purchase ten kilograms of cocaine. Defendant was present with Evans at various times, but Evans completed the drug purchase without him. Evans had $81,000 and agreed to purchase six kilograms.
The Las Vegas authorities arrested Evans and defendant. The officers detained the others, including Tina, placing her in a separate room. Defendant privately told police that he was an informant for the F.B.I. Defendant admitted that he and other people from Cleveland were involved in the transaction.
The officers subsequently sought an indictment against defendant for trafficking in controlled substances and conspiracy to possess controlled substances. He faced minimum mandatory time of ten years to life imprisonment on these charges. Defendant posted bail but failed to return to Las Vegas. The Cleveland officers arrested both defendant and Evans in November 1994. Defendant subsequently pled guilty to a reduced charge and was sentenced to two years imprisonment in Nevada.
On cross-examination, Lt. Sutton acknowledged that by providing information, defendant put himself at risk of retaliation.
Retired Cleveland Police Detective Edward Gray testified that he arrested defendant in connection with the outstanding warrant in Las Vegas. He also had information that defendant was one of the last people to see Tina alive. After being advised of his rights, defendant stated that he had picked Tina up at Gilbert Bybee's house on October 16, 1994. Tina intended to get high. Defendant drove Tina to a house at East 131st Street and Svec, gave her $100 and did not see her again. He called Gilbert looking for Tina and said that he left her on East 131st Street and she did not return. At around 2:00 a.m., the next morning, Gilbert paged him looking for Tina. Defendant told him to go back to bed and call in the morning. Gilbert called again the next morning and expressed fear that Tina was dead, and two days later, called again to tell defendant that he had learned that her body was found.
Deputy Coroner Dr. Robert Challener testified that the coroner's office received Kirkpatrick's body on October 18, 1994. The condition of the body indicated that she had been dead for thirty-six hours, give or take six hours. Dr. Challener noted that she had sustained a head injury at the time of death. Blood analysis indicated that she had cocaine, morphine and heroin in her system. Evidence of heroin was also found in her stomach, indicating that she had ingested it. There was no evidence that she was an intravenous drug user. There was a large amount of monoacteylmorpine, by product of the breakdown of heroin, in her spinal fluid which indicates that the heroin produced death very rapidly. Dr. Challener determined that she died as the result of acute heroin intoxication. The death was ruled the result of violence of undetermined origin, but was later ruled a homicide, following further police investigation.
Gilbert Bybee testified that Tina was his girlfriend and was also a friend of defendant. Gilbert last saw Tina when she left his home with defendant. Three or four hours later, defendant called Gilbert and said that Tina should be ready the following morning. Gilbert asked what defendant was talking about since he had just left with her. Defendant stated that while they were driving, Tina saw someone that she knew and asked to get out of the car two blocks away from Bybee's house.
By the next morning, Tina still had not returned home so Gilbert paged defendant and asked what kind of game was he playing. Defendant continued to insist that he had dropped her off near her home the previous evening. Later, defendant's friend Don Laster came to Bybee's house and claimed to have seen Tina at East 131st Street and Harvard. He said that Tina should be ready to leave at 8:00 a.m. Gilbert went out looking for Tina and did not find her where Laster had claimed. Gilbert did not understand why Laster and defendant did not give Tina the message about being ready if they had just seen her and he became even more suspicious when no one arrived the following morning to take her to Cincinnati. Approximately two days later, co-defendant William Allen drove by and said that Tina was found dead in a field.
Gilbert admitted that he has a criminal record of felony convictions for theft by deception, drug abuse and bank fraud.
Don Laster testified that he sold drugs with defendant and worked as defendant's bodyguard. He and defendant were involved in selling large quantities of drugs and Tina often worked with them. In the summer of 1994, he, defendant, Tina, and several other men who associated with defendant were all arrested in Las Vegas. At this time, Tina was detained separately from the men.
Defendant later learned that the police had extensive information regarding their activities and he assumed that the police had gotten it from Tina. At a meeting at Laster's house, defendant and Allen decided that they had to kill Tina. Defendant asked Laster and Durand Banner to kill her but they refused. At a subsequent meeting over breakfast, defendant stated that they should shoot Tina in the head and Allen stated that they should give her a "hot shot," or lethal dose of drugs. Laster stated that William Allen had an equal interest in the plan to kill Tina (Tr. 694). Laster further stated that defendant later called him and stated that he "got that bitch," that she was semiconscious in his basement and that he needed Laster to come to his house. When Laster arrived, he saw her slumped over on the couch and defendant stated that he had put heroin in her drink then stuffed more heroin down her throat. Defendant told him to create an alibi for him by telling Gilbert that Tina had gone off on her own. Laster went to Gilbert's and said that he had seen Tina at around midnight.
Defendant subsequently contacted Laster after the body was found and Laster removed heroin from defendant's house after defendant had been arrested. The two men eventually broke contact following a dispute over money.
Laster admitted, however, that he gave the police information regarding Tina's murder after he was arrested for selling a large quantity of crack cocaine. He stated that he had received no benefit from this cooperation, however. The plea agreement for this matter indicates, however, that the district attorney may recommend a reduced sentence at a later time in light of Laster's cooperation on other matters. Laster also admitted that he was looking for leverage against defendant because he noticed that his associates were getting into trouble, yet defendant bragged about having "friends."
Durand Banner testified that he has federal drug convictions and is presently incarcerated. He stated that he sold drugs with defendant. Banner knew that Tina moved drugs for defendant and in September 1994, he was present at a meeting when defendant and William Allen discussed soliciting someone to kill Tina. Banner stated that Allen feared that Tina would implicate him on crimes involving forged checks and defendant wanted her dead for cooperating with the Las Vegas police. At this time, William Allen stated that they should give her a "hot shot." Later, defendant asked Banner to get him three ounces of heroin for the "hot shot." Banner agreed and stated that it would cost $1,800 per ounce. Defendant came to California to get the heroin. Banner later learned from Laster that Tina was dead.
Banner admitted on cross-examination that he has entered a guilty plea in the federal matter but he will not be sentenced until after he completes his testimony in this matter.
Dwayne Walker testified that he was involved in selling large quantities of drugs with defendant. He testified that in the summer of 1994, defendant was extremely worried about criminal charges which he was facing in Las Vegas, and feared that Tina was going to testify against him. According to Walker, defendant's anxiety grew because he was unable to locate Tina after returning to Cleveland. Later, at a restaurant, defendant asked Walker to kill her and Walker refused. In October 1994, defendant called Walker and said that Tina was at his house and was nodding off.
Walker admitted that, after he had been arrested on drug charges, he contacted law enforcement authorities with information regarding this murder. He denied ever meeting William Allen.
Ernest Evans testified that he is presently incarcerated on charges involving drugs and money laundering and is presently serving eighteen years. He stated that he has sold cocaine with defendant and has remained in contact with him while in prison. According to Evans, defendant spoke of having a "handler" who was an F.B.I. agent. Evans claimed that defendant believed that Tina "had to go" because she provided information to the police.
Evans admitted that after defendant set up his brother Phil to be arrested, Evans broke contact with him and eventually contacted the F.B.I.
F.B.I. Agent James Finch testified that defendant began to work as an informant for him in 1992. The F.B.I. accepted defendant's information but does not conduct ongoing investigations of its informants. Finch subsequently learned that defendant was arrested with drugs and a weapon and Finch "closed him" as an informant. In 1994, defendant again contacted Finch with information regarding drug dealers from California. Finch informed him that he could not work as an informant if he continued to engage in criminal activity. In June 1994, after defendant had been arrested in Las Vegas, defendant asked Finch to explain to the arresting officers that he was an informant for the F.B.I.
F.B.I. Agent Stephen Vogt testified that when defendant was arrested for Tina Kirkpatrick's murder in October 1998, he stated that Tina had been with him on the night that she disappeared but he stated that he dropped her off at East 137th Street and Superior Avenue and did not see her again.
F.B.I. Agent James Hartnett testified that defendant contacted him with information concerning a large cocaine shipment which was coming from California. Defendant identified the apartment where the deal occurred but asked the agents to arrest the suspects away from the complex. Thereafter, the agents learned that the apartment had been burglarized and the drugs were stolen. As Hartnett continued to investigate other drug dealers in this area, he received information linking defendant to the killing of Tina Kirkpatrick.
Co-defendant William Allen invoked his constitutional right to refuse to testify. Thereafter, the state introduced his statement to Cleveland Police regarding his knowledge of the murder, over the objection of defendant's attorney. According to this statement, Allen admitted that he believed that Tina had made a statement to the police which led to his indictment on check forgery charges in Beachwood. At this time, defendant expressed the belief that Tina had "snitched" on him to the Las Vegas Police. On the night that Tina disappeared, Allen arrived at defendant's home and observed Tina in the basement, unconscious and with bubbles coming from her mouth. According to Allen's statement, defendant stated that he had put heroin in her wine and that there was more heroin on the table which she must have mistaken for cocaine. Allen reportedly suggested that they take her to the hospital or leave her somewhere then call 911. Later, Allen moved his vehicle out of the way so that defendant could dump the body in his vehicle.
Defendant was subsequently convicted of aggravated murder and sentenced to twenty years to life imprisonment and was also fined $10,000. Defendant, through counsel, asserts four assignments of error for our review, and also asserts six pro se assignments of error.
Defendant's first assignment of error and his first pro se and fifth pro se assignments of error are interrelated and state:
 THE APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION WHEN THE TRIAL COURT ADMITTED THE UNTESTED STATEMENT OF A NON-TESTIFYING ACCOMPLICE.
 THE COURT ERRED BY THE ADMISSION OF EVIDENCE THAT MATERIALLY AFFECTED DEFENDANT-APPELLANT'S RIGHT TO A FAIR AND UNPREJUDICED TRIAL.
 THE COURT'S ADMISSION OF AN UNTESTED CONFESSION OR STATEMENT OF NON-TESTIFYING ACCOMPLICE VIOLATED DEFENDANT'S CONFRONTATION CLAUSE RIGHTS.
Within these assignments of error, defendant complains that the trial court erred in permitting the state to introduce the statement of co-defendant William Allen because Allen's statement inculpates defendant and exonerates Allen, and there are no corroborating circumstances to indicate the trustworthiness of the statement.[1]
The Sixth Amendment of the Constitution of the United States guarantees the accused the right "to be confronted with the witnesses against him." This right, made applicable to the states through the Fourteenth Amendment, Ohio v. Roberts (1980),448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597, affords the defendant the opportunity to cross-examine those witnesses in order to explore the witness's credibility, especially his or her motivation in testifying. State v. Warren (1995), 106 Ohio App.3d 753,757.
When a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause requires a showing that he is unavailable and that the statement bears adequate "indicia of reliability" Ohio v. Roberts, supra. The reliability standard can be satisfied without more in a case where the evidence falls within a firmly rooted hearsay exception. Id. at 66,100 S.Ct. at 2539, 65 L.Ed.2d at 608. Otherwise, to satisfy the Confrontation Clause the evidence must be supported by a showing of "particularized guarantees of trustworthiness." Id.
In Lilly v. Virginia (1999), ___ U.S. ___, 119 S.Ct. 1887, the Supreme Court of the United States noted that the statement of an unavailable declarant which is offered by the prosecution to establish the guilt of an alleged accomplice of that declarant is an inherently unreliable category of hearsay. The Court determined that such statements, which shift or spread the blame to the defendant on trial, do not fall within a firmly rooted exception to the hearsay rule.
It must therefore be determined whether such statements are admissible under the Confrontation Clause's residual admissibility test, i.e., the evidence must be supported by a showing of "particularized guarantees of trustworthiness." In this connection, independent review is undertaken. Id. Further, the Lilly Court advises that the fact that other evidence corroborates the statement, the fact that the declarant has been given Miranda warnings, and the fact that the statement has portions which are against the penal interest of the declarant are all irrelevant to this review. Rather, the statement must possess indicia of reliability by virtue of its inherent trustworthiness. Significantly, the Court was especially wary of custodial confessions of the declarant given a co-defendant's "strong motivation to implicate the defendant and exonerate himself." Id., (Rehnquist, concurring); Lee v. Illinois (1986),476 U.S. 530, 541, 90 L.Ed.2d 514, 106 S.Ct. 2056.
Finally, the Lilly Court noted that, where the admission of such a statement has violated the Confrontation Clause rights of the defendant, the court is to determine whether the error is "harmless beyond a reasonable doubt" pursuant to Chapman v.California (1967), 386 U.S. 18, 24, 17 L.Ed.2d 705, 87 S.Ct. 824. That is, the state must demonstrate that beyond a reasonable doubt the statement did not contribute to defendant's conviction.Id.
In this instance, William Allen's statement shifts or spreads the blame to the defendant on trial, and therefore does not fall within a firmly rooted exception to the hearsay rule. As to whether there is a showing of "particularized guarantees of trustworthiness," we note that the government was involved in the production of the statement, it describes past events, and it was not subjected to adversarial testing. Thus, pursuant to Lilly,supra, the presumption of unreliability has not been rebutted. We are therefore compelled to conclude that error occurred in connection with the introduction of this statement.
Further considering the issue of whether the error was harmless, we conclude that this error was harmless beyond a reasonable doubt because it was manifest that Allen was simply shifting blame, and because the state's remaining witnesses established defendant's guilt beyond a reasonable doubt.
That is, as to the manifest unreliability of Allen's statement, the state's own witness Gilbert Bybee testified that Tina had a case which involved Allen, that Allen was one of the very first people to know that Tina was dead, and that it was his belief that Allen was involved in causing Tina's death. (Tr. 645). Further, Don Laster testified that William Allen had an equal interest in the plan to kill Tina (Tr. 694).
As to defendant's guilt, defendant faced a mandatory prison term in Las Vegas at the time of Tina's death and expressed his view that Tina had cooperated with the Las Vegas authorities. He purchased heroin after discussing a plan to kill Tina with a "hot shot." Defendant picked Tina up from Bybee's then called Laster and stated that he "got that bitch" and that she was semiconscious in his basement and that he needed Laster to come to his house. Laster also testified that he saw her slumped over on the couch and defendant told Laster to create an alibi for him by telling Gilbert that Tina had gone off on her own. Gilbert's testimony corroborated the creation of the false alibi.
For all of the foregoing reasons, the assigned error is harmless beyond a reasonable doubt and this assignment of error is without merit.
Defendant's third pro se assignment of error states:
 DEFENDANT-APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
Here, defendant asserts that his trial counsel was ineffective in advising defendant not to testify and in failing to call certain witnesses.
In establishing a claim of ineffective assistance of trial counsel, it is clear that a defendant must make a two-part showing:
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction *** resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington (1986), 466 U.S. 668, 687. Accord Statev. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. The Strickland court also cautioned courts examining the issue that:
 [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134 (1982). *** Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'
Id., at 689. See, also, State v. Frazier (1991), 61 Ohio St.3d 247,253. Debatable trial tactics do not constitute ineffective assistance of counsel. State v. Clayton (1980), 62 Ohio St.2d 45,49.
In State v. Williams (1991) 74 Ohio App.3d 686, 695, the court stated as follows:
 The failure of trial counsel to call a witness is a decision concerning trial strategy, and, absent a showing of prejudice, such failure does not deprive a defendant of effective assistance of counsel.
Applying the foregoing, it is clear that the decision of whether a particular individual should testify is a decision concerning trial strategy and in this instance, defendant has failed to identify what his testimony or the testimony of the unidentified other witnesses would have established. We are therefore deferential to counsel's decision and we will not credit this claim of ineffective assistance.
Defendant's second assignment of error states:
 THE APPELLANT AND CERTAIN JURORS WERE DENIED EQUAL PROTECTION OF THE LAWS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY THE STATE'S SYSTEMATIC EXCLUSION OF PROSPECTIVE JURORS SOLELY BECAUSE OF THEIR RACE AND GENDER.
Within this assignment of error, defendant asserts that the state violated his Equal Protection rights by excluding prospective jurors on the basis of race and/or gender.
In Batson v. Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69, the Supreme Court noted that the Equal Protection Clause forbids the prosecutor to challenge potential jurors on the basis of discriminatory criteria. The Batson Court established a three-step procedure for evaluating claims of racial discrimination in peremptory strikes. First, the opponent of the strike must make a prima facie showing of discrimination. Second, the proponent must give a race-neutral explanation for the challenge. Third, the trial court must determine whether, under all the circumstances, the opponent has proven purposeful racial discrimination. Id. at 96-98, 106 S.Ct. at 1723-1724,90 L.Ed.2d at 87-89; Purkett v. Elem (1995), 514 U.S. 765, 767-768,115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839; State v. Hernandez
(1992), 63 Ohio St.3d 577, 582, 589 N.E.2d 1310, 1313-1314.
With regard to the first step of demonstrating such a claim, it is clear that "`A single invidiously discriminatory act' is not `immunized by the absence of such discrimination in the making of other comparable decisions.'" Batson, 476 U.S. at 95; State v.White (1999), 85 Ohio St.3d 433, 437. Further, once the proponent explains the challenge and the trial court rules on the ultimate issue of discrimination, whether or not a prima facie case was established becomes moot. Id.
As to the second step, the Supreme Court of Ohio has stated:
 The only issue in step two of the Batson analysis is whether the proponent gave a race-neutral explanation for his peremptory challenge. The "explanation need not rise to the level of justifying exercise of a challenge for cause." Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. See, also, Purkett [v. Elm (1995)], 514 U.S. at 769, 115 S.Ct. at 1771, 131 L.Ed.2d at 839. While a prospective juror's answers may be sufficient to survive a challenge for cause, both prosecutors and defense attorneys must remain free to challenge on a peremptory basis jurors whose answers create overall concerns on the subject at issue.
State v. White (1999), 85 Ohio St.3d 433, 437. The Batson Court also noted if the trial court determines that the prosecuting attorney has provided an explanation which is credible, that determination is entitled to great deference. Id.
As to the procedures to be invoked in connection with this step of the inquiry, the court in State v. Powers (1993), 92 Ohio App.3d 400,408, stated as follows:
 When the United States Supreme Court decided Batson, it expressly declined to formulate procedures to be followed when conducting a hearing after a defendant had established a prima facie case of intentional discrimination. Batson, supra, 476 U.S. at 99, 106 S.Ct. at 1924-1925, 90 L.Ed.2d at 89-90. As a result, appellate courts across the country have been faced with a variety of procedural approaches to conducting such a hearing, ranging from simple in camera ex parte discussions with the prosecutor (see United States v. Davis [C.A.6, 1987], 809 F.2d 1194), to full-scale evidentiary hearings with witnesses and cross-examination. See Salazar v. State (Tex.App. 1990), 795 S.W.2d 187; Williams v. State (Tex.App. 1989), 767 S.W.2d 872. Nonetheless, a vast majority of appellate courts which have addressed the issue have refused to lay down strict procedural requirements for conducting a Batson hearing, and have instead afforded the trial courts broad discretion to determine what procedures are necessary in each case. See United States v. Tindle (C.A.4, 1988), 860 F.2d 125; United States v. Tucker (C.A.7, 1988), 836 F.2d 334; Davis, supra; but, addressing the issue, cf. United States v. Thompson
(C.A.9, 1987), 827 F.2d 1254. Most courts agree that the disruption caused by cross-examining the prosecutor during a Batson hearing generally outweighs any benefits which would result therefrom. *** Indeed, placing the prosecutor under oath to assure his or her honesty would add little, if any, to the proceedings in light of the Disciplinary Rule prohibiting a lawyer from knowingly making a false statement of fact. See DR 7-102(A)(5); Gray v. State (1989), 317 Md. 250, 562 A.2d 1278, 1282 ("A trial judge calling upon the prosecutor to explain his challenges has every right to expect total candor without resorting to the administration of an oath"). Moreover, in this case we are unable to discern, and defendant has been unable to articulate, what would be gained in allowing cross-examination of the prosecutor during the Batson hearing where, as here, defendant was permitted to present a rebuttal to the prosecutor's explanations for the use of peremptory challenges.
 Given the foregoing and the two-day adversarial proceeding held, during which defendant was present and was permitted to present a rebuttal to the explanations offered by the prosecutor, the trial court did not abuse its discretion in refusing defendant's request to place the prosecutor under oath and to cross-examine him. Defendant's second assignment of error is overruled.
As to the third step of the Batson inquiry, the White Court stated:
 Step three asks whether, in light of all the circumstances, the state did, in fact, have a discriminatory motive for striking the juror. The burden of persuasion always stays with the opponent of the strike. Purkett, 514 U.S. at 768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839. The trial court's finding is entitled to deference, since it turns largely "on evaluation of credibility." Batson, 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21.
 The facts in this case support the state's explanation. Dent did say that he opposed the death penalty, had been against it for over five years, and just did not believe in the death penalty. In fact, he initially said that his beliefs would prevent or substantially impair his ability to find the defendant guilty (although he later appeared to change his mind).
 Other facts also point away from a racial motivation. The state "did not attempt to exclude all blacks, or as many blacks as it could, from the jury." United States v. Montgomery
(C.A.8, 1987), 819 F.2d 847, 851. When the defense challenged a black prospective juror because she was a deputy sheriff, the state argued vigorously in favor of keeping that juror.
Applying the foregoing, we note that the trial court had discretion in determining the manner in which to conduct the Batson inquiry and the court was not required to place the prosecuting attorney under oath. Further, considering each of the jurors who are the subject of this assignment of error, we note that Mrs. Levin, a white female, stated, almost immediately after the prospective jurors were seated and before the state questioned any of the jurors, that she wanted to be off the jury, and that she was needed at work. The court then asked her whether there was any reason that she could not be fair and impartial, and in response, she stated:
 I discuss a lot with my husband. He's done a lot of cases through the years. (TR. 114).
Later, upon further questioning by the state, she explained that her husband does criminal defense work and that
 Every person my husband's represented criminally has been not guilty. *** Life isn't like that. What you're told and what is are two different things. *** (Tr. 148).
Thereafter, the prosecuting attorney informed the court that he had previously prosecuted her father-in-law's law partner and the juror's husband represented him. (Tr. 204). This juror was therefore clearly not excused in contravention of defendant's Equal Protection rights and we recognize no Batson violation herein.
As to Juror Pollard, she stated that she did not know if she could deal with hearing the case. (Tr. 201). Later, counsel for defendant asked her whether she would thought it would be necessary for defendant to take the stand and testify to his innocence and she replied, "Yes." (Tr. 221). During further questioning, she was clearly confused as to whether defendant had a burden of proof. (Tr. 222). The defense required no further explanation when she was later excused. (Tr. 309).
Juror Harris indicated that his wife was sick at home and he felt that he needed to be there with her. (Tr. 244).
On this record, no Batson violation has been demonstrated and there is no basis to disturb the trial court's ruling.
This assignment of error is without merit.
Defendant's third assignment of error, second pro se assignment of error and fourth pro se assignment of error are interrelated and state:
 THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT DENIED APPELLANT'S MOTION IN LIMINE REGARDING THE ADMISSIBILITY OF CONFORMITY EVIDENCE OF OTHER CRIMES, WRONGS OR ACTS, AS IT PERTAINS TO EVID.R. 404(B).
 PROSECUTORIAL MISCONDUCT DENIED APPELLANT HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.
 THE TRIAL COURT ERRED WHEN IT PERMITTED TESTIMONY OF OTHER CRIMES, ACTS, OR WRONGS, ATTRIBUTED TO DEFENDANT-APPELLANT TO BE INTRODUCED OVER OBJECTION AND BY ITS FAILURE TO GIVE A LIMITING INSTRUCTION BOTH DURING THE COURSE OF THE TRIAL AND IN THE GENERAL CHARGE TO THE JURY, THE PURPOSES FOR WHICH EVIDENCE PRESENTED BY THE PROSECUTOR COULD BE USED.
Within these assignments of error, defendant complains that the prosecutor committed misconduct in introducing evidence that he had a prior arrest record in Nevada. Defendant also complains that the prosecuting attorney introduced evidence that he had served as a paid government informer.
Evidence of other acts is admissible if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. State v. Lowe (1994), 69 Ohio St.3d 527,530.
In this instance, defendant does not dispute that there is substantial proof that he has an arrest record in Nevada. The relevant question is therefore whether this evidence tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The state has shown however, through the testimony of numerous witnesses, that defendant believed that Tina had turned him in to the Nevada authorities and the state argued from the beginning of this matter to the present time that it was defendant's motive to kill her in order to prevent her from testifying in that matter.
As to the evidence that defendant had worked with federal agents as an informant, we conclude that this evidence was also properly admitted since this evidence demonstrated defendant's determination to escape incarceration, and was therefore probative of his motive.
Defendant additionally complains that the state also introduced evidence that he served as an informant for the F.B.I. then allegedly double-crossed the agent with whom he was working by stealing cocaine which was to be seized. We note, however, that this information came in without objection during the testimony of Ernest Evans. (Tr. 998-1000). It came in again without objection during the testimony of Agent Vogt (Tr. 1236) and Agent Hartnett (Tr. 1287).
As to whether it was plain error to permit this information, it was introduced to demonstrate that some of the state's witnesses believed that they were incarcerated as the result of defendant providing information to the F.B.I. Specifically, Evans stated that he was testifying in this matter in order to "get even" with defendant. (Tr. 1004). Because this information could have been viewed by the jury as a basis for bias, and therefore a reason for disbelieving the witness, we find no plain error has occurred in connection with the introduction of this evidence. Similarly, the testimony from the agents concerning the events surrounding defendant's informing them of a drug deal and the subsequent disappearance of the drugs could have been interpreted as a basis for the bias of the agents and likewise does not constitute plain error. Finally, we note that the evidence concerning defendant's involvement with the F.B.I. was offered to prove the identity of the killer because it demonstrated defendant's strong motivation to avoid being incarcerated.
This assignment of error is without merit.
Defendant's fourth assignment of error and sixth pro se
assignment of error are interrelated and state:
THE VERDICT FINDING THE APPELLANT GUILTY OF AGGRAVATED
 MURDER IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. DEFENDANT-APPELLANT'S CONVICTION TO THE CHARGES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Finally, defendant contends that his conviction of aggravated murder is against the manifest weight of the evidence because the state's witnesses all had motives to lie and because there is no trace evidence to link defendant to the killing.
In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, the Supreme Court set forth the role of an appellate court in determining whether a judgment is against the manifest weight of the evidence:
 When a court of appeals reverses the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs [v. Florida (1982), 457 U.S. 31,] at 42, 102 S.Ct at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should only be granted in the exceptional case in which the evidence weighs heavily against the conviction.")
In this instance, the state's witnesses established that defendant faced charges in Las Vegas which carried a penalty of ten years to life imprisonment, that Tina was present when defendant was arrested in Las Vegas and was separately detained, and that defendant believed that Tina had provided information to the Las Vegas police. The state's evidence also demonstrated that defendant discussed killing Tina on at least two occasions, and that during one of these conversations, it was suggested that she receive a "hot shot," or heroin overdose. Defendant then purchased three ounces of heroin and was the last person to be seen with Tina. The state's evidence also demonstrated that defendant claimed to have dropped Tina off shortly after picking her up, and he asked Laster to corroborate this claim. Finally, the state demonstrated that defendant had done extensive work with police on previous occasions in order to evade punishment.
Moreover, defendant's version of events was simply not credible. First, while defendant claimed to have dropped Tina off near Bybee's home, the location changed several times in subsequent retelling. Further, it is inherently suspect that defendant called and left a message for Tina after being with her and it is also suspect that Laster reported seeing Tina then went to Bybee's to leave a message for her. Moreover, while both defendant and Bybee claimed that Tina was to be ready at 8:00 a.m., the following morning, they did not arrive to pick her up at this time and made no effort to learn her whereabouts at this time.
In accordance with the foregoing, this assignment of error is without merit.
The judgment of the trial court is affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
SWEENEY, J., CONCURS; KARPINSKI, J., CONCURS IN PART (SEEATTACHED CONCURRING OPINION)
 _______________________________ ANN DYKE, ADMINISRATIVE JUDGE
[1] The state insists however, that the defense invited error herein because the state sought to introduce only those portions of Allen's statement concerning Allen's participation in the killing, and the defense requested admission of the entire statement. This is a disingenuous argument since the statement is overall, so self-serving that it cannot in the aggregate, be considered self-inculpatory. Cf. Williamson v. United States
(1994), 512 U.S. 594, 603, 129 L.Ed.2d 476, 485, 114 S.Ct. 2431. Overall, Allen's statements concerning his involvement were offered to establish the guilt of Allen's alleged accomplice, defendant, and this is precisely the use which was condemned inLilly.