[Cite as *State v. Massalay*, 2016-Ohio-779.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                         :

      Plaintiff-Appellee,                     :

                                              No. 15AP-544

v.                                                          :                (C.P.C. No. 15CR-393)

Sherron L. Massalay,                              :         (REGULAR CALENDAR)

      Defendant-Appellant.                   :

---

D E C I S I O N

Rendered on March 1, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee. **Argued:** *Valerie Swanson*.

**On brief:** *Timothy Young*, Ohio Public Defender, and *Peter Galyardt*, for appellant. **Argued:** *Peter Galyardt*.

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Sherron L. Massalay, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of two counts of felonious assault under R.C. 2903.11 and associated firearm specifications for firing an assault rifle at two police officers. For the reasons that follow, the judgment of the trial court is affirmed.

## I. BACKGROUND

{¶ 2} On January 28, 2015, appellant was indicted for two counts of felonious assault, pursuant to R.C. 2903.11, first-degree felonies under R.C. 2903.11(D)(1)(a), with associated firearm specifications pursuant to R.C. 2941.145(A) and 2941.1412(A). Appellant pled not guilty to the charges, and the case proceeded to a four-day jury trial commencing March 30, 2015.

{¶ 3}    The venire for the trial, consisting of a total panel of 24 prospective jurors, included 18 Caucasian members, 4 African-American members, and 2 members of unidentified racial origin.  During voir dire, plaintiff-appellee, State of Ohio, used its first peremptory challenge to excuse a Caucasian prospective juror, and used its second peremptory challenge to excuse an African-American prospective juror.  Appellant objected, believing that juror to be the sole African-American on the panel, but then withdrew his objection when the presence of another African-American on the panel was noted by appellee.

{¶ 4}    Appellant renewed his objection when appellee used its third and fourth peremptory challenges to excuse two more African-American prospective jurors.  As the race-neutral basis for its third peremptory challenge, appellee pointed to the juror's employment as a social worker who "works directly for and with the people against whom the government intervenes."  (Tr. Vol. I, 100.)  The trial court, reviewing the *Batson v. Kentucky*, 476 U.S. 79 (1986) decision, overruled appellant's objection to appellee's third peremptory challenge, stating:

> I understand that [under *Batson*] the state has to provide a race-neutral reason. I do have a concern that we are eliminating African-American jurors. I am sensitive to the fact [that one juror] remains as an African-American member of this panel.
>
> *Batson* requires the defendant to show that there has been purposeful discrimination in the exclusion of these jurors. The court will find at this point there has been no purposeful discrimination. The prosecutor has provided the race-neutral reason for the exclusion of these jurors. I am going to permit the challenge [and the juror] will be removed from the panel.

 (Tr. Vol. I, 101.)

{¶ 5}    As the race-neutral basis for its fourth peremptory challenge, appellee pointed to the juror's admission that, in order to help people, she behaves in a way that she knows to be inappropriate in her position as a dispatcher for the police, and appellee expressed concern that that juror could go outside the rules to pursue her own agenda as a juror in the case.  In response, appellant's counsel noted that his client was African-American and that appellee had attempted to eliminate three out of four, or 75 percent of

the African-American pool in the venire.   The court, in again overruling appellant's objection, stated:

> I am slightly concerned about the pattern that has developed. I appreciate the fact [appellee] indicated to the court that you struck [a Caucasian juror] with your first peremptory challenge. We have eliminated a number of African-Americans, African-American descendants.
>
> I am sensitive to the fact that [appellant] is entitled to a jury of his peers. I think that would include African-American jurors, and you have provided the court with race-neutral reasons, but I am challenged by the reasons, the reasons that you have provided to this court for eliminating these prospective jurors, and I think that we are treading a dangerous line with the challenges.
>
> * * *
>
> This is about my ensuring that [appellant's] constitutional rights are protected. I am not attempting to impugn your integrity, but the *Batson* case exists for a reason, and I have to be sensitive to the reason that it exists * * * we have now had three challenges of the four African-Americans who are called as prospective jurors on this panel. * * * I heard [the last challenged juror's]  response, that she thinks that others may consider what she does a misuse of her authority or power, but that she thinks that there are several ways to achieve a certain end.
>
> * * *
>
> If the court follows the letter of the law as outlined in *Batson*, the only requirement or the reason that this case was remanded to the trial court is because the prosecutor did not provide a race-neutral basis for his challenge of African-American jurors. That is why the case was remanded to the trial court.
>
> The record has reflected that [appellee] has provided that race-neutral reason, and so the court will allow the challenge. I will just be candid, I am concerned by the challenges that I have seen, but based on the law by which this court is bound, it has little basis to challenge the race-neutral reason that was provided.

(Tr. Vol. I, 103-06.)

{¶ 6} Thereafter, the trial court empaneled the remaining jury members and appellant's trial resumed. Appellee produced the following relevant evidence in its case-in-chief.

{¶ 7} Columbus Police Officer Paul Tobin testified that around 6:30 a.m. on January 6, 2014 he was dispatched to the area of Lockbourne Road and East Sycamore regarding a traffic-related disturbance. He arrived there in uniform and in a marked cruiser, and heard yelling and screaming coming from the front porch of 872 Lockbourne Road. Tobin parked his cruiser on the east side of Lockbourne Road in front of the house, rolled down his passenger side window, and heard a man, who he identified in court as appellant, saying "get the F away from my house, I don't want you in front of my house." (Tr. Vol. II, 141.) Tobin called the other cruiser in the area to come back to the scene, and as he hung up, heard something bounce off the front right quarter panel of his cruiser. At the time he did not know exactly what had been thrown at him, but realized "something hostile had happened." (Tr. Vol. II, 141.)

{¶ 8} According to Tobin, Officer Joseph Townsend arrived in another cruiser and parked "nose to nose" with him on the east side of Lockbourne Road in front of the house. (Tr. Vol. II, 141.) Townsend exited his cruiser and approached Tobin on the driver's side of Tobin's cruiser. Tobin and Townsend stood in the middle of the roadway, and Tobin told Townsend that somebody hit the side of his cruiser with something. Tobin testified that, at that point:

> [W]e were walking down the side of my cruiser, getting ready
> to go around to the rear end of it, I could hear a male from the
> front porch yell something like, you killed Tashon or Tayron
> [sic], you are a bunch of B's, bitches. And just as I come
> around the rear end of my cruiser, I am facing the front porch,
> a huge gunshot rang out, large muzzle blast, and I dove down
> behind the cruiser to seek cover.

(Tr. Vol. II, 141-42.)

{¶ 9} Although he had a Kevlar vest on, Tobin testified that it would not protect him from a direct rifle shot. Tobin and Townsend crawled behind the engine block of Tobin's cruiser for safety, called for more officers to respond to the scene, and then raised up, guns drawn. Appellant ran back inside the house, and Tobin again heard him yelling at them while pacing back and forth between the front door and a window. SWAT officers

arrived shortly thereafter, and secured a rifle lying on the front porch. Appellant opened the front door and yelled for officers to get off his porch. SWAT officers took appellant into custody.

{¶ 10} Tobin specified that appellant fired the rifle while standing on the front porch in between the front door and window, while officers were walking around the end of Tobin's cruiser "getting ready to approach the sidewalk leading up to the front of his house." (Tr. Vol. II, 156.) Tobin believed no one else was located within the vicinity, confirmed that he could tell appellant was looking at him, and could tell that appellant fired the gun at both him and Townsend:

> There wasn't a direction of muzzle blast that you could see. You could tell it wasn't pointed down in the road or up in the air or down on the ground. It totally filled all of my peripheral vision.
>
> * * *
>
> [T]he detective asked the same question, are you certain that he fired at you? Yes.
>
> * * *
>
> [O]n the other side of the road, almost directly behind where we were standing as we were getting ready to approach his front sidewalk, there is [a] small hillside above the sidewalk, and you could tell w[h]ere a round struck the ground and put a fairly large hole into the side of the hill. It looked like a small stick of dynamite had gone into the hill. That is where we believed the round had struck.

(Tr. Vol. II, 147-48.)

{¶ 11} Tobin additionally confirmed his belief that appellant threw a "ten-inch kitchen knife or butcher knife" at him as he was in his cruiser. (Tr. Vol. II, 146.) Tobin did not actually see appellant throw the knife, but saw appellant pacing on the porch and yelling prior to the cruiser being struck by an object, saw appellant on the porch after the cruiser was struck, and discovered a large kitchen knife on the sidewalk just off the front right quarter panel of his cruiser.

{¶ 12} On cross-examination and redirect, Tobin testified that the porch was approximately 25 feet from his cruiser, with a shrub blocking the cruiser depending on the

perspective, and it was mostly dark when he arrived but street lights were on and appellant was backlit from the lights on inside the house. He confirmed that he heard only one shot, and specified the muzzle blast "filled all of my vision. All [he] could see was a muzzle blast." (Tr. Vol. II, 172.) At the time of the gunshot, Tobin testified that Townsend was "[e]ither beside me or directly behind me." (Tr. Vol. II, 186.) Tobin confirmed that, to fire multiple shots from a semiautomatic rifle, it must have a magazine, and that if you remove the magazine but a round remains in the chamber, that rifle could possibly still be a live weapon. Tobin agreed that he did not recover the bullet.

{¶ 13} Townsend testified that he was the first cruiser to arrive at Lockbourne Road, at around 6:30 a.m. on January 6, 2014, in response to the dispatch regarding a traffic-related disturbance. After trying to find people involved in the traffic incident, Townsend returned to Lockbourne Road, parked in front of Tobin's cruiser, and exited his cruiser to talk to him. He heard someone at the house in front of their cruisers yelling "I will kill you" and referencing "Tashon" or "Trayvon," and believed the individual was yelling at and confronting him and Tobin. (Tr. Vol. II, 201.)

{¶ 14} The officers approached the house to try and make contact. The officers were standing "basically directly next to each other" in the street behind Tobin's cruiser, about a half step toward the house, when, according to Townsend:

> I hear[d] commotion coming out of the house, you guys killed Tashon or Trayvon or something to that effect.
>
> I look up, and the last thing I saw was a muzzle blast probably about like this, about eye level, pointed directly at me and Officer Tobin. I am 150 percent sure that it was pointed at me as the blast went off. I mean, you could see basically a silhouette of a gun pointed directly down. Again, it was eye level for me, and I saw basically a silhouette of a person holding the gun pointed down in a downward angle at us.

(Tr. Vol. II, 202; 200-01.)

{¶ 15} Townsend testified that he believed the person on the porch, who he identified in court as appellant, fired a shot at both him and Tobin, elaborating that, right before the shot, appellant said "I will kill you, and ma[de] reference to Tashon and Travon [sic]" and "when [Townsend] saw the downward angle, this gun pointed in the direction of us, that barrel was staring me right basically between my eyes." (Tr. Vol. II, 203.)

Townsend jumped behind Tobin's cruiser to gain cover, called for help, and drew his weapon.

{¶ 16} On cross-examination, Townsend agreed that it was dark the morning of the incident, but testified that "[t]he gun was pointed right at me."  (Tr. Vol. II, 220.) Townsend confirmed that he never saw anything thrown out of the house, and that he was able to observe the porch the entire time.

{¶ 17} Detective Thomas Burton testified to being dispatched to 872 Lockbourne Road as a crime scene detective with the Columbus police department, and recording a list of photographs taken at the scene and property collected from the property.  Among photographs taken of the scene outside the home, Burton described a kitchen knife found on the sidewalk near the cruisers, "fresh damage" to the hill across the street possibly due to a bullet strike, the firearm recovered from the scene both in the trunk of police cruiser 112 and posed at the crime scene lab, a live 7.62-caliber round located in the front right passenger seat of police cruiser 112, and a spent 7.62-caliber shell casing in the grass just to the north of the walkway of 872 Lockbourne Road.  (Tr. Vol. II, 246.)  Photographs taken of the inside of the home included boxes of ammunition and an empty plastic magazine for an assault rifle located in a "middle" room, and a spent 7.62-caliber shell casing near the rear door of the home. (Tr. Vol. II, 253.) On the kitchen table, photographs document live 7.62-caliber ammunition, an empty automatic assault rifle magazine, and a long kitchen knife "comparable to the kitchen knife" found on the sidewalk.  (Tr. Vol. II, 257.)  Photographs of the upstairs show a 3.08-caliber assault rifle with a loaded magazine next to it located underneath a bedroom mattress.  Burton additionally identified and described physical property taken from the residence, including the kitchen knife from the sidewalk, live ammunition and magazines taken from inside the home, spent shell casings, and the two rifles.

{¶ 18} Burton testified that crime scene detectives were unable to locate anything from the hole in the hill across the street, and that the 7.62-caliber assault rifle did not have a magazine with it when he recovered it from the trunk of cruiser 112.  On cross-examination, Burton agreed that someone else put the rifle in the trunk of the cruiser, and he did not know how the live bullet in the front seat of that cruiser got there.  Burton further confirmed that the empty 7.62 magazine found on the kitchen table would

probably fit the assault rifle placed by police in the back of cruiser 112, but he did not verify if that magazine actually fit the rifle.

{¶ 19} On redirect and recross-examination, Burton described the common process police take to "clear" a gun to make it safe, which includes removing the magazine, checking to see if a live round remains in the chamber, and, if so, pulling the ejection bar back causing the live round to fall out of the gun. (Tr. Vol. II, 276.) Burton testified that because one live bullet could still be in the chamber of a gun even when the magazine has been removed, that gun is still capable of discharging. Burton additionally testified that, although they put in effort to determine whether a bullet existed in the potential bullet strike hole, they were unable to determine for sure that no bullet remained deeper within the hill.

{¶ 20} Kelby Ducat, a forensic scientist with the Columbus police department, testified that his tests showed that the two spent shell casings recovered from the scene had been fired from the 7.62-caliber rifle, which he determined to be operable. He confirmed that the 7.62-caliber rifle had no safety mechanism to prevent it from firing without a magazine, and therefore it was capable of firing without a magazine by individually loading bullets between shots. Such a rifle with the magazine in would automatically reload a bullet after being fired. Ducat testified that the 7.62-caliber rifle required an "average" trigger pull, measuring 4.75 pounds of force applied to the trigger in order to fire, as opposed to a hairline or heavy trigger pull. (Tr. Vol. II, 305.) Ducat agreed the empty magazine found on the table looked like the design of a magazine that would go into the 7.62-caliber rifle, and additionally found the 3.08 rifle recovered from the upstairs bedroom to be inoperable.

{¶ 21} The state moved to admit photographs of the crime scene and property taken as evidence. Appellant objected to admission of reference in exhibit B, the property logs, to the inoperable rifle and ammunition of calibers other than associated with the 7.62 rifle. The court sustained the objection, finding "any references to other ammunition or weapons that are inoperable [to be] both more prejudicial than probative," and those references to be irrelevant and also cumulative. (Tr. Vol. II, 328.) Therefore, the court admitted "Exhibit B to the extent that any references to ammunition and weapons not related to the underlying charges are redacted." (Tr. Vol. II, 328.) State's exhibit C, the

firearms lab of Ducat, was similarly admitted with redactions related to the inoperable rifle and non-7.62-caliber ammunition, and photographs depicting those same items were later removed as exhibits. Appellant likewise objected to the admission of the actual non-7.62-caliber ammunition and the inoperable firearm, and the trial court again sustained the objection, finding "its probative value is substantially outweighed * * * by the danger of unfair prejudice or confusion of the issues or of misleading the jury." (Tr. Vol. II, 332.)

{¶ 22} Appellee rested its case-in-chief. Appellant moved for a judgment of acquittal under Crim.R. 29(A), asserting appellee had failed to prove the element of "knowingly," which the court overruled. (Tr. Vol. II, 335.) Appellant and his fiancée then testified in his defense.

{¶ 23} Seniqua Venavle testified that she lived with appellant, her fiancé and the father of her two children, at 872 Lockbourne Road in January 2014. According to Venavle, appellant left the house on the evening of January 5, 2014 and returned at approximately 1:00 or 2:00 a.m., at which time she stated she was asleep upstairs with the children. When appellant returned, Venavle went downstairs, and thought "[h]e was panicking like he really thought somebody was coming to get him," "paranoid," and speaking about things that did not make sense. (Tr. Vol. III, 346-47.) She went upstairs to check on the children, heard a gunshot out the back door, and returned to find him in the kitchen. According to Venavle, for around ten minutes, appellant paced back and forth from the kitchen to the dining room with the gun, then took the bullets out of the magazine and placed the magazine and bullets on the kitchen table. Appellant continued to pace with the gun for a few hours, and she tried to calm him down while also checking on the children upstairs a couple of times. She did not see him load the gun with additional bullets. Appellant had broken their cell phones, so she could not call the police.

{¶ 24} Venavle testified that, around dawn, appellant went to the front door and began yelling "[y]ou are not going to come get me, you are not going to come get me," and then she heard, but did not see, appellant's gun go off. (Tr. Vol. III, 356.) According to Venavle, appellant dropped the gun on the porch and ran inside, tried to take cover, and told her he thought "they" were shooting him. (Tr. Vol. III, 357.) She did not know who he was referring to, and had not personally viewed anyone outside the home from her

position in the middle room of the house.  Appellant then went back to the front door and gave himself up to police.

{¶ 25} Appellant testified that the gun fired by accident.  According to appellant, on January 5, 2014 at around 10:00 p.m. he met up with a friend named Ikey, spent time at his house discussing personal problems,[1] drove around together in appellant's car, and eventually returned home around 1:00 or 2:00 a.m.  Around 5:00 or 5:30 a.m., appellant got his rifle, which he kept in his kitchen closet to protect his family, put a loaded magazine into the gun, and fired out the back door of his house—only his second time shooting that gun.  When Venavle came downstairs, he took the magazine out of the gun and emptied the bullets because he did not want to hurt anybody.  Appellant paced and shouted about somebody killing his brother, and that they were coming to kill him. Appellant got his rifle, opened his front door to make sure everything was okay, and noticed the police cruiser parked in front of the house through the trees in his yard. According to appellant, seeing the police made him "tense[] up," and the "gun went off." (Tr. Vol. III, 412.)  When asked "[d]id you think they were going to do something to you," appellant replied, "[t]he officers? * * * Maybe if I still had a gun in my hand, yeah." (Tr. Vol. III, 413.)  Appellant then testified that he dropped the gun and "walked back in the house." (Tr. Vol. III, 414.)

{¶ 26} Appellant testified that, the gun did not have the magazine in it when he dropped it, he never put a bullet in the gun and did not know how to load a bullet in the gun, he did not know the gun was loaded, and had not previously thrown a knife at the police cruiser.  Appellant further testified that he only saw the police cruiser and not the officers, never pointed the gun or tried to shoot the officers, and only held the gun to scare people off.  Appellant stated he had no criminal record and had never been arrested prior to this incident.

{¶ 27} On cross-examination, appellant had no explanation for how a large kitchen knife, which he admitted to be from his kitchen, ended up by the police cruisers, and denied yelling at the officers either before the gun fired or when the SWAT team arrived.

---

[1] The trial court repeatedly sustained objections regarding appellant's description of drug and alcohol use at Ikey's home, and a subsequent claim of hearing voices, after having previously determined that appellant's voluntarily intoxication was not a defense to the knowingly element of felonious assault, and an insanity defense was neither affirmatively pled nor argued.

Appellant testified that, at the time of the incident, he understood that a bullet remains in the chamber of the rifle when the magazine is removed, and specified "I thought I cleared the gun. I never said I did not know that there was a bullet in the gun." (Tr. Vol. III, 441.) Appellant agreed that no one else was outside at the time of the incident. Explaining how the gun went off, appellant testified, "I told you, I tensed up when I seen the officers, when I seen the cruiser, I tensed up, and the gun went off. I never pointed the gun at nobody." (Tr. Vol. III, 443.)

{¶ 28} After appellant's testimony, both parties rested. The jury found appellant guilty of both counts of felonious assault, pursuant to R.C. 2903.11, as well as the firearm specifications under both counts. A sentencing hearing was held on May 6, 2015 after which the judge imposed for Count I, a sentence of 4 years incarceration with an additional 7 years for the firearm specification, and, for Count II, a sentence of 4 years incarceration with an additional 7 years for the firearm specification. The judge ran the sentences for two felonious assault counts concurrently to each other and consecutively to the firearm specifications, for a total of 18 years incarceration. Appellant filed a timely appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 29} Appellant submits four assignments of error for our review:

> [I.] The trial court erred in denying Sherron Massalay's Crim.R. 29 motion for acquittal, and violated his rights to due process and a fair trial when, in the absence of sufficient evidence, it convicted him of the second count of felonious assault and accompanying 7-year firearm specification. Fifth and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution. R.C. 2903.11(A)(2); R.C. 2941.1412.

> [II.] The trial court erred when it did not merge Sherron Massalay's second felonious-assault and firearm-specification convictions. R.C. 2941.25. Fifth and Fourteenth Amendments, United States Constitution; Section 10, Article I, Ohio Constitution.

> [III.] Sherron Massalay was deprived of his constitutional right to equal protection. Fourteenth Amendment, United States Constitution; Section 2, Article I, Ohio Constitution.

[IV.] Sherron Massalay was deprived of his constitutional right to the effective assistance of counsel. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution.

## III. DISCUSSION

### A. First Assignment of Error

{¶ 30} In his first assignment of error, appellant contends appellee presented insufficient evidence to sustain two convictions under R.C. 2903.11. For the following reasons, we disagree.

{¶ 31} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 32} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Further, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 33} In order to find appellant guilty of felonious assault, for each count appellee had to prove beyond a reasonable doubt that appellant "knowingly * * * attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). "Physical harm" means "any injury, illness, or other, physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 34} Furthermore, "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). A person acts "knowingly" to support multiple counts of felonious assault under R.C. 2903.11 where testimony establishes that the person fired one shot at multiple victims. *State v. Neal*, 2d Dist. No. 82 CA 82 (Jan. 20, 1984) (holding sufficient evidence supported two counts of felonious assault where victims testified defendant "aimed it (gun) at us" and defendant "took the shot at us"); *State v. Mills*, 62 Ohio St.3d 357 (1992) (evaluating sufficiency of evidence to support defendant's convictions for felonious assault for multiple victims by proximity to shot and whether victims where "in the line of fire" of the shot). *See also State v. Gowdy*, 6th Dist. No. E-06-071, 2009-Ohio-385, ¶ 23-25 (holding that evidence was sufficient to support defendant's convictions for felonious assault for two victims where defendant fired one bullet into victims' home).

{¶ 35} Appellant argues that the officers' testimony demonstrates that it is factually impossible for both officers to have been struck by the one bullet fired, and therefore appellant "could not have been 'aware that his conduct [would have] probably cause[d] a certain result,' relative to the second victim." (Appellant's Brief, 8.) As such, appellant argues appellee presented insufficient evidence on the "knowingly" element of the second conviction.

{¶ 36} In support of his argument, appellant cites to *State v. Nolan*, 141 Ohio St.3d 454, 2014-Ohio-4800, ¶ 10. In *Nolan*, the Supreme Court of Ohio determined it was impossible to commit "attempted felony murder." *Id.* In doing so, the court specified, "an attempt crime must be committed purposely or knowingly and intent to kill need not be proven for the state to obtain a conviction for felony murder, so that a person can be convicted of that offense even though the death was unintended." *Id.*

{¶ 37} It is apparent that *Nolan* dealt with the impossibility of purposely or knowingly committing a strict liability offense, which does not require intent. Therefore, *Nolan* is not controlling on our issue of whether appellee proved the requisite mens rea of "knowingly" required for the underlying offense of felonious assault based on the facts at hand.

{¶ 38} Moreover, the record here supports appellant's conviction for each separate conviction. Tobin testified that appellant was yelling obscenities, that he believed appellant threw a large kitchen knife at him, and answered "yes" when asked "are you certain that [appellant] fired at you?" (Tr. Vol. II, 147.) Townsend testified that he heard appellant yelling "I will kill you," that he believed appellant aimed the threats at the officers, and testified that the rifle was pointed directly at both him and Tobin. (Tr. Vol. II, 201.) Moreover, we do not find that the record shows, as appellant suggests, that it was factually impossible for both officers to be physically harmed by one shot. The officers' testimony established that the semiautomatic rifle is a powerful weapon, and that the officers were in very close proximity to each other when the shot was fired, in such position to appellant that each officer believed the rifle to be aimed at him. In addition, under *Neal* and *Mills*, this testimony establishes that both officers were in the line of fire and at risk of injury by appellant's single shot. Therefore, if believed, the evidence presented by appellee supports appellant's second conviction for felonious assault and the associated gun specifications.

{¶ 39} Accordingly, appellant's first assignment of error is overruled.

### B.  Second Assignment of Error

{¶ 40} In his second assignment of error, appellant contends that trial court erred when it did not merge his two felonious assault and firearm specification convictions under R.C. 2941.25 because it is factually impossible for the conduct to have harmed two victims. We disagree.

{¶ 41} Ohio law generally prohibits a defendant from being convicted of more than one "allied offense[] of similar import." R.C. 2941.25(A). "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph one of the syllabus. More

specifically, "a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus. "Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus. An appellate court reviews the trial court's R.C. 2941.25 determination de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699.

{¶ 42} As previously resolved in the first assignment of error, the circumstances of this case do not support appellant's factual impossibility argument. As the evidence presented at trial was sufficient to convict appellant of felonious assault for the count associated with Tobin as well as the count associated with Townsend, this is a case involving two separate victims. Therefore, under *Ruff*, the conduct constitutes offenses of dissimilar import within the meaning of R.C. 2941.25(B), and the convictions do not merge.

{¶ 43} Accordingly, appellant's second assignment of error is overruled.

**C.  Third Assignment of Error**

{¶ 44} In his third assignment of error, appellant contends that he was deprived of his constitutional right to equal protection because the prosecution discriminated based on race in its peremptory challenges. For the following reasons, we disagree.

{¶ 45} In *Batson*, the United States Supreme Court set the basic "three-part process for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause." *Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003) ("*Miller-El I*"). "First, a defendant must make a prima facie case that the prosecutor is engaged in racial discrimination." *State v. Johnson*, ___ Ohio St.3d ___, 2015-Ohio-4903, ¶ 21, citing *Batson* at 96-97. " Second, if the defendant satisfies that burden, the prosecutor must provide a racially neutral explanation for the challenge." *Id.*, citing *Batson* at 97-98. "Finally, the court must decide, based on all the circumstances, whether the defendant has proved purposeful racial discrimination." *Id.,* citing *Batson* at 98. "In doing so, the court

must consider the circumstances of the challenge and access the plausibility of the prosecutor's explanation in order to determine whether it is merely pretextual." *Id.*, citing *Miller-El I* and *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohi0-5048, ¶ 65. *See also Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("*Miller-El II*"). "In short, the trial court must decide whether the prosecutor's reason is credible." *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 62.

{¶ 46} However, the trial court does not have a duty to independently investigate a prosecutor's race-neutral explanation. *Johnson* at ¶ 22. Neither is the trial court generally obligated to explicitly state its reasoning for accepting the prosecutor's race-neutral reasons. *State v. Adams*, ___ Ohio St.3d ___, 2015-Ohio-3954, ¶ 160; *Thompson* at ¶ 63-64 quoting *Smulls v. Roper*, 535 F.3d 853, 863 (8th Cir.2008) (finding that, even though trial court initially expressed doubts about the prosecutor's race-neutral explanation, the judge's ultimate "denial [of the *Batson* challenge] was 'itself a finding at the third step' of *Batson*, reflecting the court's determination that the [race-neutral] explanation was credible"). *See, e.g., Johnson* at ¶ 29, 42. Rather, "the trial court may express its opinion of the state's race-neutral justification in the form of a clear rejection of the *Batson* challenge, without offering detailed findings, ' "[a]s long as [the] trial judge affords the parties a reasonable opportunity to make their respective records." ' " *Adams* at ¶ 160, quoting *Frazier* at ¶ 98, quoting *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir.2006).

{¶ 47} " 'The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' " *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 22, quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995). "Because the issue of discriminatory intent often turns on the prosecution's credibility, it is 'a finding of fact of the sort accorded great deference on appeal.' " *Id.*, quoting *Hernandez v. New York*, 500 U.S. 352, 364-65 (1991). "Accordingly, '[a] trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous.' " *Thompson* at ¶ 53, quoting *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 106. Where an appellant questions the trial court's proper analysis of a *Batson* challenge, no clear error occurs where the appellate court can determine from the record that "the trial judge's analysis of the contested peremptory strike was sufficient to

preserve a constitutionally permissible jury-selection process." *Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 99-102 (1997) (finding trial court's ruling, "while imperfect in form," did not ultimately unconstitutionally compromise the integrity of the jury selection process).

{¶ 48} Appellant argues that the trial court did not use the correct standard under *Miller-El I* and *Miller El II*, which calls for the court to determine whether stated reasons for peremptory challenges are the "*actual reasons*" for peremptory strikes. (Emphasis sic.) (Appellant's Brief, 17.) Specifically, appellant argues that the trial court "simply accepted [appellee's] facially-neutral offerings" without considering relevant circumstances such as: appellee's offered basis for striking the African-American social worker applied equally to the Caucasian crime victim, appellee's use of three out of four challenges to exclude African-American venire members, and that appellee "used *race-specific* observations to buttress its 'race-neutral' reasons." (Emphasis sic.) (Appellant's Brief, 18.) According to appellant, these circumstances prove that appellee's offered reasons were not the actual reasons for the strikes.

{¶ 49} As a preliminary issue, *Miller-El I* and *Miller El II* do not state a new standard of analysis under *Batson*, whereby a trial court must determine the "actual reasons" for the peremptory challenge. Rather, the standard remains[2] that "the court must decide, based on all the circumstances, whether the defendant has proved purposeful racial discrimination." *Johnson* at ¶ 21, citing *Batson* at 98.

{¶ 50} Here, the trial court was aware that it must ultimately decide whether appellant "show[ed] that there has been purposeful discrimination in the exclusion of these jurors." (Tr. Vol. I, 101.) By expressing that "based on the law by which this court is bound, it has little basis to challenge the race-neutral reason that was provided," the trial court indicated that it knew that appellee's race-neutral reason was not synonymous with a lack of purposeful discrimination, while also expressing the difficulty in challenging that race-neutral reason under the law, at least on the facts and arguments of this case. (Tr. Vol. I, 106.)

---

[2] We note that the Supreme Court of the United States is currently considering *Batson* challenges in *Foster v. Chatman*, U.S.S.C. No. 14-8349, ___ U.S. ___.

{¶ 51} The trial court's solicitation of arguments from both attorneys regarding the excluded jurors at issue, and its express consideration of a range of circumstances in support of and against the strikes, further supports our finding that the trial court did not simply accept the race-neutral reasons presented by appellee. For example, regarding its third peremptory strike, appellee stated a concern that the juror was a social worker working on behalf of those people against which the "government intervenes." (Tr. Vol. I, 100.) In response, appellant argued that the social worker was the second African-American excused. After those arguments, the trial court expressed concern over the elimination of African-American jurors, expressly considered that another African-American remained on the panel, and concluded that no purposeful discrimination had occurred at that point and that appellee's reason was race-neutral. Regarding its fourth peremptory strike, appellee stated a concern that the juror admitted she went outside of rules to help people. Appellant countered, again, with the number of African-Americans excluded. After expressly considering circumstances such as her personal recollection of that juror's response during voir dire, appellee's use of its first strike on a Caucasian woman, and a pattern where appellee used three out of four strikes against African-Americans, the trial court allowed appellee's challenge and excused that juror. Based on a careful reading of the record, we find the trial court's analysis of the contested peremptory strikes to be sufficient to preserve a constitutionally permissible jury selection process. *Hicks. See also State v. Jenkins*, 2d Dist. No. 2015-CA-6, 2015-Ohio-5167, ¶ 35 (holding trial court was not in error in overruling peremptory challenge where trial court concluded, "I'm not a 100% sure that [reason] carries the day, however, I'm only looking for a neutral reason, and the fact that her husband has been convicted of a crime is a sufficiently neutral reason, so I will permit the peremptory in this regard for the record").

{¶ 52} The record likewise does not support appellant's arguments aimed at undermining the trial court's ultimate determination to reject appellant's *Batson* challenges. First, while statistics of peremptory challenges used to strike African-American venire members is evidence of purposeful discrimination, it is not conclusive. *See generally Miller-El II* (analyzing bare statistics as well as factors such as similarity of voir dire answers, juror shuffling, disparate questioning, and the history of the prosecutor's office's discrimination). Further, appellee's reason for striking an African-

American juror because she was a social worker who repeatedly works directly with people against whom the government intervenes does not "appl[y] just as well," as appellant suggests, to a Caucasian panelist who had once been a crime victim when the perpetrator was never found by police, and therefore does not tend to prove purposeful discrimination. *Miller-El II* at 241. Finally, appellee's statement that it used a peremptory challenge to exclude a Caucasian venire member and did not challenge an additional African-American member of the jury may be taken into account as part of the circumstances tending to disprove purposeful discrimination. *State v. White*, 85 Ohio St.3d 433, 438 (1999), *rev'd on other grounds*. Therefore, based on the record, we do not find the trial court's rejection of appellant's *Batson* challenges to rise to the level of clear error.

{¶ 53} Accordingly, appellant's third assignment of error is overruled.

### D. Fourth Assignment of Error

{¶ 54} In his fourth assignment of error, appellant contends that he was deprived of the effective assistance of counsel because his trial counsel failed to object to certain evidence that was "more prejudicial than probative" and to "material misstatements of evidence" which prejudiced him. (Appellant's Brief, 19.) As such, appellant asks us to vacate his convictions and sentence. We disagree.

{¶ 55} "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [court] cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "To establish a claim of ineffective assistance of counsel, a defendant must show that the performance of trial counsel was deficient and that the deficient performance prejudiced him." *State v. Frye*, 10th Dist. No. 14AP-988, 2015-Ohio-3012, ¶ 11, citing *Strickland* at 687. To demonstrate that counsel's performance was deficient, the defendant must show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *State v. Canada*, 10th Dist. No. 14AP-523, 2015-Ohio-2167, ¶ 89. In doing so, the defendant must overcome the strong presumption that counsel's performance was adequate or that counsel's actions might be considered sound trial strategy. *Id.* at ¶ 90. "The 'failure to make objections does not constitute ineffective assistance of counsel *per*

*se*, as that failure may be justified as a tactical decision.' " (Emphasis sic.) *State v. Loughman*, 10th Dist. No. 10AP-636, 2011-Ohio-1893, ¶ 63, quoting *State v. Gumm*, 73 Ohio St.3d 413, 428 (1995). To demonstrate that the deficient performance prejudiced him, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Id.* "The failure to make either showing defeats a claim of ineffective assistance of counsel." *Frye* at ¶ 11, citing *Strickland* at 697.

{¶ 56} Appellant first takes issue with his trial counsel's failure to object to testimony regarding an additional gun and ammunition found in appellant's home, which appellant says has no relevance to the charged offenses and is more prejudicial than probative. Trial counsel later objected to, and the trial court excluded the admission of and various references to such evidence in exhibits by determining it was, alternatively, irrelevant, prejudicial, and cumulative. Appellant particularity takes issue with appellee's discussion of the other guns and ammunition in conjunction with the presence of children in the home "as some kind of character defect that suggested guilt." (Appellant's Brief, 21.)

{¶ 57} We note that even though trial counsel for appellant explicitly advanced an accident theory to disprove the knowingly element of felonious assault, the record is replete with his attempts to show appellant's altered and paranoid state of mind. This theory was forbidden from the outset of trial as the trial court determined voluntary intoxication to not be a defense to the knowingly element of felonious assault, and an insanity defense was neither affirmatively pled nor argued. Nonetheless, trial counsel's initial failure to object to the testimony regarding the other guns and ammunition may have been a tactical decision on his part. Regardless, even if counsel's decision not to object to testimony regarding the other guns and ammunition was in error, appellant has not shown that such objection would have resulted in a different outcome in his trial. Toward the pertinent issue at trial, appellee offered the testimony regarding the other guns and ammunition to rebut the defense's accident theory by showing knowledge of guns and rifles. However, this evidence was not appellee's only, or even strongest, evidence on that point. Even without the testimony of the other guns and ammunition, appellee still could rely on the officers' testimony regarding appellant's directed insults

and threats leading up to the rifle firing, seeing appellant point the rifle in their direction, and Tobin's belief that appellant threw a large knife at him.  In addition, appellant's testimony attempting to dispute the "knowingly" element of felonious assault at times conflicted with the physical evidence and lacked credibly.  For example, appellant admitted the knife was from his kitchen, but claimed he had no knowledge of how it got there.  Appellant admitted he knew how to operate the gun, and oscillated from accidently firing the gun—just tensing up—to admitting firing the gun but not knowing a bullet remained in the chamber.  Therefore, appellant has not proved that his trial counsel's failure to object to testimony regarding an additional gun and ammunition found in appellant's home had a reasonable probability of producing a different outcome in his trial.

{¶ 58} Regarding appellant's contention that his trial counsel's failure to object to appellee's references to other guns and ammunition in the presence of appellant's children in the home, we find no error.  Appellee's cited reference to the guns in the home with the children was in response to appellant's contention that he kept the rifle in the home to protect his family, but was, perhaps, not familiar with how to operate that rifle safely.  Beforehand, Venavle volunteered and discussed the presence of children in the home repeatedly.  Furthermore, the prejudicial effect of appellee's reference to children in the home with the presence of other guns and ammunition would likely be minimal, considering the jury would nonetheless be aware of the childrens' presence around the rifle and ammunition at issue in the case, and appellant otherwise fails to explain how an objection would change the result of the trial.

{¶ 59} Finally, appellant takes issue with trial counsel's failure to object to appellee's "cumulative, material misstatements of the evidence."  (Appellant's Brief, 22.)  Our review of the record shows that appellee drew reasonable inferences in characterizing a photograph depicting a live bullet on the seat of the police cruiser as a bullet emptied from the gun in question, and in characterizing a disturbance in the snow as an actual bullet strike even when no bullet was actually located.  *Canada* at ¶ 79, quoting *Treesh* at 466 ("[P]rosecutor 'may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument.' ").  Therefore, trial counsel was not in error for not objecting to these characterizations.

{¶ 60} Appellant is correct that appellee's statement in closing which indicated that Tobin testified to actually seeing appellant throwing a knife at the cruiser is a misstatement. Tobin testified that he believed appellant threw the knife at the cruiser after he saw appellant on the porch before and after hearing an object hit his cruiser, and later seeing a large knife on the sidewalk off of his cruiser. Nevertheless, appellant has not proven prejudice from this statement. The jury heard the actual testimony themselves, and were explicitly told by the judge: "You must not consider as evidence any statement of any attorney made during the trial, and so the opening statements and closing arguments of counsel are not evidence in this matter." (Tr. Vol. II, 119-20.) The jury is presumed to follow instructions given by the court. *State v. Morris*, 10th Dist. No. 05AP-1032, 2007-Ohio-2382.

{¶ 61} Moreover, as previously discussed, appellant admitted he fired the gun, and ample evidence existed to show appellant's knowledge to support his conviction for felonious assault. Therefore, because appellant has not demonstrated a reasonable probability exists that, but for counsel's failure to object to appellee's alleged "cumulative, material misstatements of the evidence," the result of the trial would have been different, appellant has failed to prove prejudice. (Appellant's Brief, 22.)

{¶ 62} Accordingly, appellant's fourth assignment of error is overruled.

## IV. CONCLUSION

{¶ 63} Having overruled appellant's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and HORTON, JJ., concur.

_____