The STATE of Ohio, Appellee,

v.

POWERS, Appellant.

[Cite as *State v. Powers* (1993), 92 Ohio App.3d 400.]

Court of Appeals of Ohio,
Franklin County.

No. 93AP–416.

Decided Dec. 7, 1993.

*Michael Miller,* Franklin County Prosecuting Attorney, and *Joyce Anderson,* for appellee.

*James Kura,* Ohio Public Defender, and *Robert L. Lane,* for appellant.

PEGGY BRYANT, Presiding Judge.

Defendant-appellant, Larry Joe Powers, appeals from a judgment of the Franklin County Court of Common Pleas finding that he failed to prove that the prosecutor at his murder trial purposely used the state's peremptory challenges to exclude African–Americans from his petit jury solely on the basis of their race.

On August 8, 1985, defendant, a white male, was indicted on two counts of aggravated murder in violation of R.C. 2903.01 and one count of attempted aggravated murder in violation of R.C. 2903.01 and 2923.02; each count carried a firearm specification. Defendant subsequently entered a plea of not guilty and requested a jury trial.

Prior to beginning jury selection, the prosecutor and defense counsel agreed that each would have twelve peremptory challenges. In the course of selecting

the jury, the prosecutor removed ten individuals by means of peremptory challenges; seven of the ten were African–Americans. Each time the prosecution challenged an African–American venire-person, defendant objected, arguing that the prosecutor was using his peremptory challenges to purposely exclude African–Americans from the jury in contravention of *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. The trial court overruled each objection.

Defendant was convicted on one count of murder, one count of aggravated murder, and one count of attempted aggravated murder. On appeal, this court rejected defendant's *Batson* challenge, finding that defendant had "completely failed to meet the first test of *Batson*," which requires that a defendant show " 'that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.' " *State v. Powers* (Dec. 13, 1988), Franklin App. No. 87AP–526, unreported, 1988 WL 134822, quoting *Batson, supra*, 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88. The Ohio Supreme Court denied defendant's motion for leave to appeal, finding that the case presented "no substantial constitutional question." (1989), 42 Ohio St.3d 702, 536 N.E.2d 1172, rehearing denied (1989), 42 Ohio St.3d 717, 538 N.E.2d 1071.

The United States Supreme Court granted defendant's petition for certiorari and issued a decision holding that defendant had standing to object to such an exclusion of jurors in violation of the Equal Protection Clause even though he is not of the same race as the excluded jurors. *Powers v. Ohio* (1991), 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411. Accordingly, the court reversed defendant's conviction and remanded the case to this court. *Id.*

On remand, this court sustained defendant's *Batson* argument and remanded the case to the common pleas court to determine whether defendant had made a prima facie showing of purposeful discrimination in the selection of the petit jury for his trial, and, if so, to afford the prosecutor an opportunity to come forward with race-neutral explanations for the use of the state's peremptory challenges.

Finding that defendant had established a prima facie case of purposeful discrimination, the trial court set a hearing date to allow the prosecutor to explain his peremptory challenges and the defendant to rebut the prosecutor's explanations. Prior to the hearing, defendant filed two motions, one seeking leave of court to present the expert testimony of Dr. Solomon Fulero on the issue of the prosecutor's motives in challenging the African–American venire-persons, the other requesting that the hearing be conducted with the prosecutor under oath and subject to cross-examination. The trial court denied defendant's request to place the prosecutor under oath and cross-examine the prosecutor, and it deferred ruling on the admissibility of Dr. Fulero's testimony pending its presentation.

During the hearing, the prosecutor who had represented the state at defendant's trial presented his explanations for each of the ten peremptory challenges he had exercised during the course of voir dire. Following the prosecutor's statement, defense counsel presented the testimony of his expert witness, Dr. Fulero, subject to the court's final admissibility determination. Pursuant to the parties' agreement, defendant presented further rebuttal to the prosecutor's explanations by way of a post-hearing memorandum.

On February 25, 1993, the trial court issued a decision, concluding that the prosecutor's "statement of his race-neutral reasons for peremptorily challenging the seven black jurors * * * [were] credible and not pretextual * * * [and that] defendant has failed to meet his burden of proving intentional racial discrimination by a preponderance of the evidence." Defendant appeals therefrom, assigning the following errors:

"I. The court erred in concluding that Larry Joe Powers failed to meet his burden of proving intentional racial discrimination and in reinstating the judgment and sentence. (Decision and judgment entry filed Feb. 25, 1993, R. 417, 418).

"II. The court of common pleas erred in denying Mr. Powers a full adversarial hearing on the *Batson* issue.

"III. The court of common pleas erred in refusing to admit the testimony of expert witness Dr. Solomon Fulero."

■ Ordinarily, a prosecutor may exercise a peremptory challenge "for any reason, or no reason at all." *Hernandez v. New York* (1991), 500 U.S. 352, 374, 111 S.Ct. 1859, 1874, 114 L.Ed.2d 395, 416–417 (O'Connor, J., concurring). Under well-established principles of equal protection jurisprudence, however, a peremptory challenge may not be used purposefully to exclude members of a cognizable racial group from jury service solely on the basis of their race. See *Powers, supra; Batson, supra,* 476 U.S. at 84, 106 S.Ct. at 1716, 90 L.Ed.2d at 79. Where a defendant can establish a prima facie case that the prosecutor has used his peremptory challenges in such a manner, the burden shifts to the state to articulate racially neutral explanations related to the particular case for the use of its challenges. *Batson, supra,* 476 U.S. at 98, 106 S.Ct. at 1723–1724, 90 L.Ed.2d at 88–89. Although a prosecutor's explanations need not rise to the level of justifying the exercise of a challenge for cause, the prosecutor may not rebut a defendant's prima facie case "merely by denying that he had a discriminatory motive or 'affirm[ing] good faith in making individual selections.'" *Id.*

■ The decision of a trial court regarding a prosecutor's motives for exercising a peremptory challenge is a factual determination which will not be overturned unless clearly erroneous. *State v. Cook* (1992), 65 Ohio St.3d 516, 519,

605 N.E.2d 70, 77. Further, because such a determination will necessarily turn in large part upon a credibility evaluation, an evaluation which a trial court is best situated to make, the trial court should be accorded great deference by a reviewing court. *Batson, supra,* 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21.

Defendant's prima facie case of purposeful race-based discrimination by the prosecutor is undisputed. Defendant further argues, however, that the race-neutral explanations advanced by the prosecutor for five of the seven challenges used to remove African–Americans from defendant's petit jury are not supported by the record and amount to nothing more than a mere pretext for purposeful racial discrimination.[1]

■ Defendant first objects to the prosecutor's removing Norma Wooden from the jury. At the hearing, the prosecutor stated that he challenged Wooden because she was not in favor of the death penalty; he was "nervous regarding her prior employment as a barmaid, since the defense was expected * * * [to] argue the defense of intoxication"; and "she was very much in favor of the defense of self defense * * *." The prosecutor's explanations are supported in the record at least with regard to Wooden's view on the death penalty and the prosecutor's concern about how Wooden might view the defense of intoxication. During voir dire, Wooden responded to the prosecutor's inquiry regarding her view on the death penalty, stating that she "never cared for it too much because * * * everybody has a right to life." Wooden also stated that she had previously worked in a bar and had seen friendly individuals become combative after excessive drinking.

Defendant however argues that the prosecutor's explanations regarding his challenge of Wooden are pretextual, as the response of Ann F. Maggart, a white woman whom the prosecutor did not challenge, was similar to Wooden's concerning the death penalty; further, like Wooden, Maggart had previously worked in a bar. Although similarities exist between Wooden and Maggart, sufficient differences allow the prosecutor to have reasonably found one acceptable and the other not. Specifically, Wooden's statement regarding her view on the death penalty reveals possible opposition to the death penalty itself. Maggart's response, however, reveals only a concern that such a penalty be imposed in only the most serious cases and only when guilt has been properly established. Further, while both Wooden and Maggart had previously worked in bars, the bar in which Wooden had been employed bore a much closer resemblance to the bar involved

---

1. Defendant apparently concedes that the prosecutor had genuine, nonracial reasons for challenging African–American venire-persons Maurice Eckels and Alexis Daniels, as he has not addressed the removal of those two individuals in his brief.

in defendant's case than did any of the establishments in which Maggart had worked.

■ Defendant next objects to the prosecutor's challenge to Renee Smith Page. The prosecutor explained that he challenged Page because he felt that she was "obviously against the death penalty even in the most serious cases." When asked about her view on the death penalty, Page responded that she didn't "understand how you can kill someone just because they killed somebody else." Page's response provides sufficient grounds for the prosecutor to have concerns about Page's opposition to the death penalty.

Defendant again argues that the prosecutor's explanation is pretextual, pointing to the testimony of Sharon Black, a white juror the prosecutor did not challenge. When she was first questioned about the death penalty, Black stated that she felt it was not up to her to decide if a person should die. Upon further questioning by both the prosecutor and defense counsel, Black indicated that she believed that an individual convicted of premeditated murder should be sentenced to death irrespective of any mitigating circumstances. Black's statements provide ample explanation for the prosecutor's failure to challenge Black, despite a challenge to Page.

■ Defendant next objects to the peremptory challenge exercised by the prosecutor to exclude Frances Jackson from his jury. The prosecutor stated that he challenged Jackson because she would not give him a "firm commitment" on her position on the death penalty, and because she had difficulty understanding the legal concepts of burden of proof and proof beyond a reasonable doubt. Defendant asserts that the prosecutor's reasons for exercising the challenge are not supported in the record.

The record arguably supports the prosecutor's assertion that Jackson would not give him a "firm commitment" on the death penalty. In responding to a question about her view on the death penalty, Jackson stated with some ambivalence that "I feel like I could say I think I believe in the death penalty." Nonetheless, Jackson's response, as tempered by subsequent questions, suggests as firm a commitment to the death penalty as that of Maggart, a white juror whom the prosecutor did not challenge.

However, the record does support the prosecutor's claim that Jackson was having difficulty understanding certain legal concepts. In an attempt to gauge potential jurors' understanding of the burden of proof, defense counsel asked each juror upon which party they felt the burden of proof should rest in a case of an alleged debt, the debtor or the creditor. Jackson answered that it seemed fair to her to place the burden of proof on the alleged debtor. While Jackson's initial inclination to place the burden of proof on defendant might suggest a juror

favorable to the state, Jackson's responses reflect an inability to comprehend basic legal concepts, which in turn hinders her ability to weigh the merits of the state's case independent from the conclusions reached by the other jurors. Thus, Jackson's responses support the explanation the prosecutor offered to justify a peremptory challenge. Further, the record does not suggest that the explanation is pretextual.

■ Defendant next objects to the challenge to Juanita Litzy, arguing that the record does not support the reasons the prosecutor advanced for the challenge. The prosecutor stated that he removed Litzy because she would not give him a firm commitment on the death penalty, and because she was a "liberal teacher who leaned strongly toward rehabilitation as a punishment rather than the death penalty." The reasons the prosecutor gave for his challenge of Litzy are supported by the record. When asked about her personal feelings on the death penalty, Litzy stated that she "can't say that I am for the death penalty. I also cannot say that I'm not." When defense counsel asked whether she believed that the emphasis in prison should be on rehabilitation, Litzy responded "yes." Finally, Litzy spoke in very positive terms about a federally funded program which sought to teach convicted criminals a trade, and for which her husband had been employed as an instructor. Together, these statements are sufficient to support the prosecutor's concerns about having Litzy as a juror. Further, defendant has pointed to no evidence, and we have found none, which would indicate that the prosecutor's explanation for challenging Litzy is pretextual.

■ The last challenge to which defendant objects removed Larcenia Bosley from defendant's jury. The prosecutor explained that he challenged Bosley for two reasons: (1) because "initially she refused to give her opinion on the death penalty, although she later did," and (2) because her husband from whom she was separated was an "alcoholic," which raised concerns about her ability to fairly and impartially consider the defense of intoxication. Although Bosley was somewhat slow in formulating her response to the prosecutor's inquiry about her feelings on the death penalty, she ultimately stated that she thought the death penalty would be an appropriate penalty where someone committed a purposeful killing. Thus, the support in the record for the prosecutor's concerns about Bosley's views on the death penalty is questionable. Nonetheless, Bosley did state that her husband "drinks all the time," and that this fact had played a role in their separation; her statement is sufficient to justify the prosecutor's concern about Bosley's ability to objectively consider the defense of intoxication. Again, the record does not suggest that the explanation is pretextual.

Having considered each of the five peremptory challenges to which defendant objects on appeal, and having found the race-neutral explanations offered by the prosecutor for the exercise of these challenges to be supported by the record and

not pretextual, we cannot say that the decision of the trial court was clearly erroneous.  Defendant's first assignment of error is overruled.

■ Defendant's second assignment of error contends that defendant was denied a fair hearing on his *Batson* challenge when the trial court refused to permit him to cross-examine the prosecutor under oath regarding his explanation for his use of peremptory challenges.

■ When the United States Supreme Court decided *Batson*, it expressly declined to formulate procedures to be followed when conducting a hearing after a defendant had established a prima facie case of intentional discrimination. *Batson, supra,* 476 U.S. at 99, 106 S.Ct. at 1924–1925, 90 L.Ed.2d at 89–90.  As a result, appellate courts across the country have been faced with a variety of procedural approaches to conducting such a hearing, ranging from simple *in camera ex parte* discussions with the prosecutor (see *United States v. Davis* [C.A.6, 1987], 809 F.2d 1194), to full-scale evidentiary hearings with witnesses and cross-examination.  See *Salazar v. State* (Tex.App.1990), 795 S.W.2d 187; *Williams v. State* (Tex.App.1989), 767 S.W.2d 872.  Nonetheless, a vast majority of appellate courts which have addressed the issue have refused to lay down strict procedural requirements for conducting a *Batson* hearing, and have instead afforded the trial courts broad discretion to determine what procedures are necessary in each case.  See *United States v. Tindle* (C.A.4, 1988), 860 F.2d 125; *United States v. Tucker* (C.A.7, 1988), 836 F.2d 334; *Davis, supra;* but, addressing the issue, cf. *United States v. Thompson* (C.A.9, 1987), 827 F.2d 1254.  Most courts agree that the disruption caused by cross-examining the prosecutor during a *Batson* hearing generally outweighs any benefits which would result therefrom.[2] Indeed, placing the prosecutor under oath to assure his or her honesty would add little, if any, to the proceedings in light of the Disciplinary Rule prohibiting a lawyer from knowingly making a false statement of fact.  See DR 7–102(A)(5); *Gray v. State* (1989), 317 Md. 250, 562 A.2d 1278, 1282 ("A trial judge calling upon the prosecutor to explain his challenges has every right to expect total candor without resorting to the administration of an oath").  Moreover, in this case we are unable to discern, and defendant has been unable to articulate, what would be gained in allowing cross-examination of the prosecutor during the *Batson* hearing where, as here, defendant was permitted to present a rebuttal to the prosecutor's explanations for the use of peremptory challenges.

Given the foregoing and the two-day adversarial proceeding held, during which defendant was present and was permitted to present a rebuttal to the explana-

---

2.  While the hearing herein occurred post-trial, defendant's rights post-trial are no greater than were his rights during his trial.  Nor has defendant shown that the lapse of time creates circumstances which mandate greater procedures post-trial than during trial.

tions offered by the prosecutor, the trial court did not abuse its discretion in refusing defendant's request to place the prosecutor under oath and to cross-examine him. Defendant's second assignment of error is overruled.

Defendant's third assignment of error challenges the trial court's decision not to admit the testimony of defendant's expert, Dr. Solomon Fulero. Initially, we note that the trial court did not refuse to admit Dr. Fulero's testimony based upon a *per se* rule that expert testimony was inappropriate at a *Batson* hearing. Rather, the court's decision was based upon a finding that Dr. Fulero's testimony was not helpful. Therefore, our review of this matter is limited to the question of whether the trial court abused its discretion in refusing to admit Dr. Fulero's testimony in this case. See *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 148, 524 N.E.2d 881, 885–886.

Evid.R. 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in a form of an opinion or otherwise."

While this rule establishes the standard for admitting expert testimony, the trial court has the discretion to decide on a case-by-case basis whether a given expert's testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 148–149, 446 N.E.2d 444, 447–448.

Defendant offered the expert testimony of Dr. Fulero for the purpose of rebutting the nonracial explanations offered by the prosecutor for challenging the seven African–American venire-persons. Specifically, Dr. Fulero testified that his analysis of the voir dire transcript revealed little real difference between the attitudes of the challenged African–Americans and the white individuals allowed to remain on defendant's jury with regard to the death penalty and the defenses of self-defense and voluntary intoxication. Dr. Fulero also testified that his statistical analysis of the challenges revealed that the odds against a factor other than race accounting for the challenges of the seven African–Americans were "astronomically high."

After listening to Dr. Fulero's testimony in its entirety, the trial court determined that the testimony would not assist the court in making its ultimate determination regarding the prosecutor's true motives in challenging the African–American venire-persons. Whether or not Dr. Fulero's testimony may have been of some value, we find no prejudicial error in the trial court's actions. Specifically, although the trial court stated that it was declining to admit Dr. Fulero's testimony, it also stated that "even if [it] were to consider the proffered testimony

of Dr. Fulero, [its] finding would be unchanged." Thus, the court ultimately concluded that, "[c]onsidering all the circumstances including the proffered testimony of Dr. Fulero, * * * none of the prosecutor's peremptory challenges was race-based." Based upon the foregoing, defendant's third assignment of error is overruled.

Having overruled each of defendant's three assignments of error, we affirm the judgment of the trial court.

*Judgment affirmed.*

BOWMAN and PETREE, JJ., concur.