[Cite as *State v. Sheppard*, 2025-Ohio-4924.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                                    :

      Plaintiff-Appellee,                           :                    No. 24AP-741
                                                (C.P.C. No. 23CR-3934)

v.                                                               :

                                            (REGULAR CALENDAR)

Marquise L. Sheppard,                                            :

      Defendant-Appellant.                          :

---

D E C I S I O N

Rendered on October 28, 2025

---

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond*.

**On brief:** *Brian J. Rigg*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

JAMISON, P.J.

{¶ 1}   Defendant-appellant, Marquise L. Sheppard, appeals from convictions by jury trial in the Franklin County Court of Common Pleas.  For the following reasons, we affirm the judgment of the trial court.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}   The incident that gave rise to this matter was the shooting deaths of D.M. and C.W. on or about July 31, 2023.

{¶ 3}   On August 10, 2023, a Franklin County Grand Jury indicted appellant on the following charges: two counts of murder, violations of R.C. 2903.02(A), unclassified felonies; two counts of felonious assault, violations of R.C. 2903.11, felonies of the second degree; two counts of murder, violations of R.C. 2903.02(B), unclassified felonies; tampering with evidence, a violation of R.C. 2921.12, a felony of the third degree; and having weapons while under disability, a violation of R.C. 2923.13, a felony of the third degree.  All of the charges except for tampering with evidence were accompanied by 54-

month firearm specifications pursuant to R.C. 2941.145(D). The charge of tampering with evidence was accompanied by an 18-month firearm specification pursuant to R.C. 2941.141(D). Each of the murder and felonious assault charges included repeat violent offender ("RVO") specifications pursuant to R.C. 2941.149(A).

{¶ 4} Appellant entered not guilty pleas to all charges and specifications.

{¶ 5} A jury trial commenced on September 23, 2024.

{¶ 6} At the conclusion of voir dire, challenges for cause were exercised and granted on Prospective Jurors Nos. 6, 14, and 20. For the purposes of clarity, throughout our decision, we will be referring to individual jurors by their prospective juror numbers.

{¶ 7} Following challenges for cause, the plaintiff-appellee, State of Ohio, exercised its first peremptory challenge on prospective Juror No. 7. Appellant excused Prospective Juror No. 3.

{¶ 8} When the state attempted to exercise a peremptory challenge on Prospective Juror No. 1, appellant raised a *Batson* challenge. In support of his challenge, appellant stated that only 8 of the 34 individuals on the venire were African-American. After hearing arguments from both sides, the trial court denied the state's peremptory challenge. The state then exercised its peremptory challenge on Prospective Juror No. 4, which was granted.

{¶ 9} Prospective Jurors Nos. 5 and 9 were excused at the request of appellant. The state exercised a peremptory challenge on Prospective Juror No. 19, who had slipped into the spot vacated by Prospective Juror No. 9. Appellant again raised a *Batson* challenge:

> [DEFENSE COUNSEL]: Judge, again, we have previously cited the numbers here. And [appellant] is African-American. [Prospective Juror No. 19] is of African-American descent . . . The only question I had really propounded to her was the one witness, if believed by you, by the State of Ohio. And I believe she answered that . . . she could decide if the Judge instructed her as such.

(Sept. 23, 2024 Tr. Vol. I at 234.) The trial court gave the state an opportunity to respond before the court determined whether the defense had made a prima facie case. The state responded as follows:

> [PROSECUTOR]: Your Honor, for those statistics, 4 of the 12 right now are African-American or of African-American descent. [Prospective Juror No. 19] would be 5 of 12. So I don't

> know if just stating the statistics is enough to indicate that there is a Batson [c]hallenge. It has to be more than that to make a prima facie case. And in this situation statistics aren't going to help.
>
> And then if we go back to my challenge for cause because, with [Prospective Juror No. 19], she indicated using the State's estimation of her response was that she would have a very difficult time following the Judge's instruction that one witness, if believed by you, would be enough. And the State has concerns about her not being able to follow the law but apply her own standards in this particular case. So based on that information, Judge, we would ask the Court to uphold.

(Tr. Vol. I at 234-235.)  The court responded that it recalled that Prospective Juror No. 19 "was pretty dug in on she would need more than one witness and essentially saying I need more than what the jury instructions say, are going to say, are going to allow me to do." *Id.* at 235.  Based on that, the court denied appellant's *Batson* challenge and found that a prima facie case was not made.  Appellant objected to the ruling, which the court noted for the record.

{¶ 10} Appellant exercised the final peremptory challenge on Prospective Juror No. 11.

{¶ 11} The state's first witness was officer Michael Keegan of the Columbus Police Department ("CPD").  On the night of July 31, 2023, he was dispatched with his partner, officer Alvarado Colon, to a shooting at an apartment complex on Plum Creek Drive in Columbus, Franklin County, Ohio.  Upon his arrival, he observed two victims, one by a dumpster and another off to the right in a grassy area.  A couple of the complex's residents were rendering aid to one of the victims.  Officer Keegan attended to the victim by the dumpster and officer Colon went to the victim in the grassy area.  Officer Keegan did not feel a pulse on the first victim, so he started chest compressions.

{¶ 12} Shortly after officers Keegan and Colon began administering aid, other CPD units and medics arrived on scene.  Officer Keegan continued chest compressions until the medics took over, loaded the victim into the ambulance, and transported him from the scene.  Officer Keegan remained on scene to be interviewed by detectives and help canvas for evidence.

{¶ 13} J.R. testified that on the night of July 31, 2023, he was returning home in the area of Plum Creek Drive.  As he was walking up to his first-floor apartment, he observed

an SUV and people arguing.  The SUV was not in a parking space and a group of people were getting out of the vehicle, arguing, pushing, and shoving.  The group continued arguing as he got ready for the night.  J.R. testified that there were five or six people in the group.  It included a "big guy," a "small guy," and a female.  (Tr. Vol. II at 297.)  J.R. testified there may have been two other men behind the larger male.

{¶ 14}  At one point, the larger male and smaller male were pushing and shoving, and the female got between the two of them.  A second female with long hair began pushing and hitting the first female.  The first female who was between the two males tried to calm everybody down.  The smaller male said, "You going to pull a gun out on me. You going to wet me, wet me?"  (Tr. Vol. II at 299.)  At that point J.R. went to go check on his dinner and he heard gunshots.

{¶ 15}  When he heard the gunshots, J.R. went outside and grabbed his girlfriend, who was smoking a cigarette at the time, and brought her inside.  J.R. went back outside and saw that the vehicle was gone.  As he was walking back to his apartment, he heard a faint cry for help.  He rushed over and observed a deceased female on the ground.  She was the female who was trying to de-escalate the argument.  Because he could not help her, he went over to the male victim, who was the smaller male from the altercation.  J.R. took his shirt off and tried to plug the man's wound.  As he was rendering aid to the victim, the SUV returned and left again.  J.R. began performing chest compressions and mouth-to-mouth on the male victim.  At the conclusion of his direct examination, J.R. identified appellant as the larger male involved in the altercation.

{¶ 16}  Officer Jeffrey Ward of the CPD testified that on the night of the incident he was on routine patrol.  He received a "be on the lookout" for a gold Chevrolet Suburban that was involved in a double shooting.  (Tr. Vol. II at 326.)  Officer Ward began searching one of the major roads leading from the scene of the shooting and observed a gold SUV driving towards him.  He began following the vehicle and subsequently initiated a high-risk traffic stop.  There were four occupants in the vehicle: Appellant, G.H., M.C., and J.T.  Officer Ward identified appellant as the front seat passenger in the vehicle.  No firearm was recovered from the vehicle, but officer Ward advised other patrol officers to search a certain area where the occupants may have ditched one.

{¶ 17} Following the traffic stop, the four suspects were transported to CPD headquarters for booking and to be interviewed by detectives. Officer Ward recalled that while appellant was sitting in the booking area, he yelled at one of the other suspects something to the effect of "[w]e don't talk, we all walk." (Tr. Vol. II at 336.)

{¶ 18} Officer Brian Schmiedebusch with the CPD testified that following the traffic stop, he responded to the area of Cassady and 5th Avenues to search for a gun that may have been discarded from the suspects' vehicle. When he did so, he observed a firearm laying in the street. He blocked off traffic to prevent traffic from driving through the area of the evidence.

{¶ 19} J.B., J.R.'s girlfriend at the time, testified that on the night in question, she worked until 9:00 p.m. and got home around 9:30 p.m. She hung out with J.R. for a bit and then went outside to smoke a cigarette around midnight. As she was smoking, she heard loud music and saw a gold or light tan SUV. She could hear arguing over the music and the vehicle stopped in front of the dumpsters. When the vehicle stopped, three men and three women emerged and continued arguing. At that point, J.B. pulled out her phone and began recording the argument.

{¶ 20} The argument began escalating. Two men were fighting near the back of the SUV. One man was small and skinny, and the other was a bigger man with muscles. Two women were fighting near the front of the SUV. One of the women had very long hair. The women stopped fighting and tried to get the two men to stop fighting. As the two men fought, the smaller man said, "Are you going to pull a gun on me?" (Tr. Vol. II at 379.) Then the smaller guy said, "You're going to wet me? Go ahead, wet me." (Tr. Vol. II at 379.) The men continued to curse at each other. Then she observed the bigger man raise his arm and she heard gunshots.

{¶ 21} At this point, the car pulled off and J.R. physically pulled her into the apartment for safety. When J.B. and J.R. went outside, they heard a man calling for help. J.B. called 9-1-1. She checked on the female victim, while J.R. attended to the male victim. The female victim had a gunshot wound to her head and appeared deceased. J.B. went over to help J.R. with the male victim. At that time, J.B. observed the gold SUV return. J.R. and J.B. ran and hid over an embankment. After the vehicle left, they returned to the male victim and J.R. began performing CPR.

{¶ 22} Richard Bair was a detective in the Crime Scene Search Unit ("CSSU") for the CPD. On the night in question, he was called out to the scene on Plum Creek Drive. He and another CSSU detective photographed the scene and collected various items of evidence. They also photographed and recovered the firearm that was located on 5th Avenue. Detective Bair also responded to headquarters and photographed three of the suspects. He collected blood that was found on one of the suspect's hands. That individual was identified as M.C. Bair also administered a gunshot residue ("GSR") test on M.C.'s hands. He also performed a GSR test on J.T.

{¶ 23} The state's next witness was G.H. At the time of his testimony, G.H. was 15 years old. G.H. testified that on July 31, 2023, he was in a vehicle, similar to a Suburban, with a number of individuals. He identified appellant as being one of the individuals in the vehicle. Following his arrest, he agreed to talk to the state for a reduction in his juvenile delinquency charge. Of the five other people in the vehicle, G.H. testified he only knew appellant and J.T.

{¶ 24} G.H. testified that at some point that night they stopped at an apartment complex to drop off somebody. When the vehicle stopped, an argument ensued. The argument was between appellant and the other male. It began in the vehicle and escalated outside of the vehicle. G.H. testified that shots were fired during the argument. Prior to the shooting, there was a gun in the car and G.H. was in possession of it. He gave it to J.T.

{¶ 25} During the course of G.H.'s testimony, the state requested that G.H. be called as a court witness. The trial court granted the request over appellant's objection.

{¶ 26} Following the trial court's ruling, the following exchange took place:

Q. Did you hear the argument between [appellant] and this other dude?

A. No. I just heard yelling.

Q. No, what?

A. I just heard yelling.

Q. You heard yelling? Anything specific like --

A. I don't remember no words that was said.

Q. Say that again.

A. I don't remember no words that was said.

Q. If you were shown or listened or had the opportunity to listen to the proffer that you had with Detective Jude, would that help refresh your recollection as to who had guns and what was said specifically?

A. No.

Q. Well, I'm going to show you -- I guess I need to mark this as an exhibit.

[DEFENSE COUNSEL]: Judge, can we approach?

THE COURT: Yes.

. . .

[DEFENSE COUNSEL]: Judge, I'm going to object to this. This is a summary of a statement written by [d]etective Jude. This is not this young man's words. So you can't refresh his recollection based off of a report that was written by someone else.

[PROSECUTOR]: I understand the concern about that, Judge. We do have the audio recording. It's just lengthy.

THE COURT: Was this signed by the witness?

[PROSECUTOR]: It was not, no. I don't know if [G.H.'s attorney] -- how he responds with his client testifying in this matter.

THE COURT: All right.

[DEFENSE COUNSEL]: You can't cross him -- basically what they're trying to do is based off evidence outside of 609.

[PROSECUTOR]: So based on the information, I can ask him questions.

THE COURT: So here's -- here's what we're going to do. You can ask this witness did you tell [d]etective so-and-so, whoever is in this --

[PROSECUTOR]: Thank you.

THE COURT: He can say yes or no. But I agree, I don't think that a report not written by him can refresh his recollection. But you can certainly have this report. You met with [d]etective so-and-so? Yes. Did you tell him, this, this, and see where he goes. And if he continues to answer questions in a way that's contradictory to the way he answered them before, our next move would be to bring [G.H.'s attorney] up here and see if he can advise his client of the importance of abiding by his agreement. And if that doesn't help, then we might have to play the video.

[PROSECUTOR]: Yes, sir.

THE COURT: Thank you, gentlemen.

(Tr. Vol. III at 497-499.)

{¶ 27} Following the trial court's ruling, G.H. testified that he told detective James Jude of CPD that he heard appellant "say he was going to wet [D.M.] up." (Tr. Vol. III at 500.) He also told detective Jude that appellant asked J.T. for the handgun and that appellant took the handgun from her. G.H. testified that he told detective Jude that when appellant got back into the SUV, he said, "Just take me to see my kids. I just threw my life away[.]" (Tr. Vol. III at 501.) He told detective Jude that C.W. was trying to keep appellant and D.M. away from each other.

{¶ 28} G.H. testified that he saw appellant shoot at least one time. After the shooting, G.H. grabbed the firearm from appellant and threw it out of the window of the SUV.

{¶ 29} On cross-examination, G.H. agreed that his statement to police on the night of the incident was materially different than his testimony.

{¶ 30} Following G.H.'s testimony, stipulations of certain facts and evidence were read to the jury. One of the stipulations was the contents of the testimony of Dr. Erica Armstong, a forensic pathologist at the Franklin County Forensic Science Center. Dr. Armstrong performed the autopsy on D.M. D.M. had a total of three gunshot wounds. In Dr. Armstrong's opinion, to a reasonable degree of scientific certainty, D.M.'s death was caused by gunshot wounds of the "neck, trunk and right lower extremity with spinal, visceral, skeletal and soft tissue injuries." (Tr. Vol. III at 528.)

{¶ 31} Dr. Armstrong also performed the autopsy on C.W. C.W. had one gunshot wound. In Armstrong's opinion, to a reasonable degree of scientific certainty, C.W.'s death was caused by a gunshot wound of the "neck, vascular, skeletal and soft tissue injuries." (Tr. Vol. III at 531.)

{¶ 32} The parties stipulated to the contents of the testimony of Erica Pattie, a forensic scientist with the Columbus Police Crime Laboratory. Pattie examined the firearm recovered in this case and determined that it was operable. In Pattie's opinion, within a reasonable degree of scientific certainty, the spent cartridge case found at the scene was fired from the recovered firearm.

{¶ 33} The parties stipulated to the contents of the testimony of Michelle Snyder, a forensic scientist with the Ohio Bureau of Criminal Investigation. Snyder performed GSR analyses in this case. Snyder determined that the GSR kits associated with G.H., J.T., and appellant did not have particles characteristic of gunshot primer residue in their samples. Snyder determined that the GSR kit associated with M.C. was positive for particle characteristics of gunshot primer residue in her sample. Snyder opined that a positive GSR test "means that individual either discharged a firearm, was in the vicinity of a firearm when it was discharged, or handled an item with gunshot primer residue on it." (Tr. Vol. III at 534.) Furthermore, a negative GSR test "does not preclude the possibility that an individual either discharged a firearm, was in the vicinity of a firearm when it was discharged, or handled a firearm with gunshot primer residue on it." (Tr. Vol. III at 534.)

{¶ 34} Following the presentation of the parties' stipulations, detective Jude testified. On the night in question, detective Jude responded to the scene. Once it was determined that suspects were detained, detectives Jude and Gregory L. Stevens left the scene to interview those individuals at headquarters. In addition to interviewing the suspects, detective Jude obtained and reviewed cellphone video taken by J.B. In that video detective Jude could identify several of the suspects.

{¶ 35} At the close of the state's case-in-chief, appellant made a Crim.R. 29 motion for acquittal. The trial court denied that motion.

{¶ 36} Appellant requested that the following language be included in the jury instructions: "Testimony of [G.H.], should be viewed with grave suspicion and weighed with great caution." (Tr. Vol. IV at 634.) The trial court declined to include the language.

{¶ 37} Ultimately, appellant was found guilty of all charges and specifications except for Count 7, tampering with evidence. The trial court sentenced appellant to a total prison term of life imprisonment, with parole eligibility after 46 and one-half years.

{¶ 38} Appellant now brings this appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 39} Appellant assigns the following as trial court errors:

> 1. THE COURT VIOLATED THE DEFENDANT'S RIGHT TO A FAIR TRIAL WHEN IT DENIED THE BATSON CHALLENGE RAISED BY COUNSEL.

2. THE TRIAL COURT ERRED BY PERMITTING THE STATE TO IMPEACH ITS OWN WITNESS WITHOUT A PROPER SHOWING OF SURPRISE AND AFFIRMATIVE DAMAGE AS REQUIRED BY EVIDENCE RULE 607(A).

3. THE COURT COMMITTED REVERSIBLE ERROR WHEN IT REFUSED TO GIVE THE APPROPRIATE JURY INSTRUCTIONS CONCERNING THE TESTIMONY OF AN ACCOMPLICE.

## III. STANDARD OF REVIEW

{¶ 40} In challenging a peremptory strike under *Batson v. Kentucky*, 476 U.S. 79 (1986), " '[t]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' " *State v. Jennings*, 2009-Ohio-6840, ¶ 22 (10th Dist.), quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Discriminatory intent behind a peremptory challenge frequently depends on the prosecutor's credibility and is a finding of fact afforded great deference on appeal. *Id.* A trial court's determination that there was no discriminatory intent behind a peremptory challenge will not be reversed unless clearly erroneous. *State v. Thompson*, 2014-Ohio-4751, ¶ 53. "Where an appellant questions the trial court's proper analysis of a *Batson* challenge, no clear error occurs where the appellate court can determine from the record that 'the trial judge's analysis of the contested peremptory strike was sufficient to preserve a constitutionally permissible jury-selection process.' " *State v. Massalay*, 2016-Ohio-779, ¶ 47 (10th Dist.), quoting *Hicks v. Westinghouse Materials Co.*, 1997-Ohio-227, ¶ 16.

{¶ 41} A trial court's decision to call a witness as its own and to permit both parties to cross-examine that witness is reviewed for an abuse of discretion. *State v. Menefee*, 1995 Ohio App. LEXIS 4300, *13 (10th Dist. Sept. 29, 1995). An abuse of discretion exists when the trial court has an unreasonable, arbitrary, or unconscionable attitude in reaching its decision. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 42} A trial court's decision on whether to give a requested jury instruction will also not be reversed absent an abuse of discretion under the facts and circumstances of the case. *State v. A.W.P.*, 2020-Ohio-4707, ¶ 49 (10th Dist.). " 'An appellate court will not reverse a conviction in a criminal case due to jury instructions unless the jury instructions amount to prejudicial error.' " *State v. Carter*, 2024-Ohio-444, ¶ 15 (10th Dist.), quoting *State v. Munye*, 2015-Ohio-3362, ¶ 15 (10th Dist.).

## IV. LEGAL ANALYSIS

{¶ 43} In his first assignment of error, appellant alleges that the trial court violated his right to a fair trial by denying his challenge to one of the state's peremptory challenges pursuant to *Batson*, 476 U.S. 79. Ordinarily, a prosecutor may exercise a peremptory challenge "for any reason, or no reason at all." *Hernandez v. New York*, 500 U.S. 352, 374 (1991). However, based on the principle of equal protection, such a challenge "may not be used purposefully to exclude members of a cognizable racial group from jury service solely on the basis of their race." *State v. Powers*, 92 Ohio App.3d 400, 405 (10th Dist. 1993), citing *Powers v. Ohio*, 499 U.S. 400 (1991).

{¶ 44} Pursuant to *Batson*, courts use a three-prong analysis for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause. *Massalay*, 2016-Ohio-779, at ¶ 45 (10th Dist.). Under the first prong, a defendant must establish a prima facie case showing that the state engaged in racial discrimination with its peremptory challenge. *Ohio v. Williams*, 2021-Ohio-3491, ¶ 25 (10th Dist.). This is done by demonstrating (1) the state peremptorily challenged members of a cognizable racial group, and (2) the facts and any other circumstances raise an inference that the state used its challenges to exclude jurors on the basis of race. *State v. Berry*, 2019-Ohio-3902, ¶ 12 (10th Dist.).

{¶ 45} If the defendant establishes a prima facie case under the first prong, the state must present a racially neutral explanation for the challenge. In order to sustain its burden, the state must provide a " 'clear and reasonably specific explanation' " of its valid reason for exercising its challenge. *Berry* at ¶ 26, quoting *Batson* at 98, fn. 20. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez* at 360. Discriminatory intent is present if the explanation is a pretext for exclusion on the basis of race. *Hicks*, 78 Ohio St.3d at 99.

{¶ 46} Under the third prong, "the court must decide, based on all the circumstances, whether the defendant has proved purposeful racial discrimination." *State v. Johnson*, 2015-Ohio-4903, ¶ 21. The court's analysis must focus on the circumstances surrounding the challenge and it must assess the credibility of the state's explanation in order to determine whether it is pretextual. *Massalay* at ¶ 45.

{¶ 47} In this case, although the trial court sought a race-neutral explanation from the state, it ultimately determined that appellant had not established a prima facie case under the first prong of the *Batson* test. At the trial court level, appellant's *Batson* argument focused on the fact that the venire was only 23.5 percent (8 of 34 prospective jurors) African-American. On appeal, appellant's argument focuses on the state's alleged different treatment of similarly situated white prospective jurors. Appellant asserts that the state used its peremptory challenge on Prospective Juror No. 19, but did not strike Prospective Jurors Nos. 4, 7, and 20. (Appellant's Brief at 15.) He alleges that despite all 4 of these jurors having similar doubts as to whether they could convict based on one witness's testimony, the only individual struck by the state was Prospective Juror No. 19, an African-American.

{¶ 48} First, as to appellant's argument regarding the makeup of the venire, that is not relevant to a *Batson* challenge. A *Batson* challenge focuses on the state's use of its peremptory challenge(s). A challenge to the makeup of the venire is based on the United States Supreme Court's decision in *Taylor v. Louisiana*, 419 U.S. 522 (1975), which held that "[a]n essential component of the Sixth Amendment right to a jury trial includes the selection of a petit jury from a representative cross-section of the community." *State v. Orlandi*, 2006-Ohio-6039, ¶ 14 (10th Dist.). Even if this factor was considered in assessing appellant's *Batson* challenge, the actual jury in this case had a higher percentage of African-Americans than the venire. The record reflects that 4 out of the 12 jurors (33 percent) who made it on to the jury were African-American. (Tr. Vol. I 234-235.) This fact weighs heavily against a finding that the state was using its peremptory challenges in a racially discriminatory manner.

{¶ 49} As to appellant's argument that the state treated Prospective Juror No. 19 differently than similarly situated jurors, that contention is belied by the record. Appellant asserts that the state did not strike Prospective Jurors Nos. 4, 7, and 20 despite them also expressing concerns about convicting someone based on one witness's testimony. That is inaccurate. The state exercised peremptory challenges on both Prospective Jurors Nos. 4 and 7. (Tr. Vol. I at 227, 232.) A peremptory challenge was unnecessary for Prospective Juror No. 20 because she was excused for cause. (Tr. Vol. I at 226.) Thus, there is no

evidence that the state treated similarly situated prospective white jurors differently than Prospective Juror No. 19. In fact, the record reflects the opposite.

{¶ 50} Based on the foregoing, the trial court's determination that appellant failed to establish a prima facie case under the first prong of the *Batson* test was not clearly erroneous. Appellant's first assignment of error is overruled.

{¶ 51} In his second assignment of error, appellant alleges that the trial court erred by permitting the state to impeach G.H. in violation of Evid.R. 607(A). However, a review of the record reveals that the court did not permit the state to impeach G.H with extrinsic evidence. (Tr. Vol. III at 499.) When the state attempted to confront G.H. with the recording of his proffer, the court instructed the state to lay a foundation before using his recorded statement to CPD. When the state resumed its direct examination of G.H., his answers were seemingly consistent with his statements during the proffer, and it became unnecessary to impeach him with extrinsic evidence.

{¶ 52} In his argument on appeal, appellant likens this case to *State v. Debord*, 2023-Ohio-4204 (2d Dist.). In that case, the Second District Court of Appeals summarized what happened at the trial court level as follows:

> After Wilson's response, the State began to ask Wilson if watching the video of his police interview would help refresh his memory as to what he had told the police Debord said to him. The trial court, however, interrupted the [s]tate and stated the following:
>
> If you're going to impeach, then I wish you would just impeach. By that, I mean lay a foundation of who he talked to, when he talked to them. *If he doesn't remember, that's a basis to impeach.* But I don't know that I'm going to go with refreshing at this juncture[.]
>
> . . .
>
> Following the trial court's statement, the State attempted to lay a foundation to impeach Wilson. In doing so, the [s]tate asked Wilson if he remembered being interviewed by the police and Wilson responded that he did. Wilson also confirmed that he had watched a portion of the video-recorded interview in the prosecutor's office. Despite this, Wilson testified that he did not remember what the police had asked him during the interview. The State then directly asked Wilson if, during the interview, he remembered telling the police that Debord had told him that he had shot someone. In response, Wilson said: 'No.'. . . After

> Wilson's response, the trial court permitted the State to impeach Wilson by playing a portion of his video-recorded police interview that showed Wilson telling the police that Debord had told him he (Debord) had shot someone.

(Emphasis and brackets in original.) (Internal citations omitted.) *Debord* at ¶ 66-67. In finding that the trial court committed obvious error in permitting the state to impeach the witness, the Second District Court of Appeals noted that the witness not remembering certain details does not rise to the level of affirmative damage required by Evid.R. 607(A). *Id.* at ¶ 68.

{¶ 53} A review of the record reveals that this case is distinguishable from *Debord*. In *Debord*, after a foundation was laid, the state's witness continued to answer questions inconsistently with his prior statement to police. *Debord* at ¶ 67. This caused the state to impeach him with the recording of his police interview. *Id.* It should also be noted that the trial court in *Debord*, unlike here, did not call the witness as its own. The obvious error in *Debord* was the trial court allowing the state to use that recording to impeach the witness. *Id.* at ¶ 68. Here, after the state laid a foundation for the statements made by G.H. during his proffer, G.H. began to answer questions consistently with his prior statements. The state never had to impeach him with the recording of his police interview. As such, *Debord* is not applicable here.

{¶ 54} Even assuming, arguendo, that the state impeached G.H. during his testimony, Evid.R. 607 " 'does not apply when the trial court calls the witness pursuant to Evid.R. 614.' " *State v. Peterson*, 2008-Ohio-2838, ¶ 48 (10th Dist.), quoting *State v. Kraus*, 2007-Ohio-6027, ¶ 19 (12th Dist.). In *Peterson*, this court determined that the trial court properly allowed the state to introduce prior inconsistent statements made by the witness during a proffer to impeach the witness's trial testimony. This was so because the court called the witness as its own pursuant to Evid.R. 614(A). Thus, even if G.H. continued to testify contrary to his statements made during his proffer, the state would have been permitted to impeach him with his recorded statement because the court called G.H. as its own witness.

{¶ 55} Based on the foregoing, the trial court did not err in its handling of the state's direct examination of G.H. Appellant's second assignment of error is overruled.

{¶ 56} In his third assignment of error, appellant alleges that the trial court committed reversible error when it refused to give his requested jury instruction regarding

G.H.'s testimony. More specifically, appellant asserts that the court was required to give a jury instruction regarding accomplice testimony pursuant to R.C. 2923.03(D). Appellant asserts that "it can be concluded without a doubt" that G.H. was an accomplice because he was in possession of the firearm while the fighting was going on, provided the firearm to appellant, and threw the firearm out of the window after the incident. (Appellant's Brief at 35.)

{¶ 57} Initially, it should be noted that appellant did not request a R.C. 2923.03(D) jury instruction based on G.H.'s status as an accomplice. In fact, appellant readily admitted that G.H. was not an accomplice. The instruction was requested simply because G.H. proffered in exchange for a reduction of a juvenile delinquency charge that arose out of this incident. Specific arguments not raised below are forfeited and plain error applies to those arguments. *State v. Barnes*, 2025-Ohio-1967, ¶ 58 (12th Dist.); *State v. Ammons*, 2022-Ohio-1902, ¶ 42 (9th Dist.). This is so even if the party objected on a different basis or objected with no explanation. *Id.*

{¶ 58} Because appellant, for the first time on appeal, argues that the court erred because G.H. was an accomplice, he has waived all but plain error. Crim.R. 52(B) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error is one that " 'rises to the level of challenging the legitimacy of the underlying judicial process itself.' " *State v. Santiago*, 2003-Ohio-2877, ¶ 11 (10th Dist.), quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122 (1997). "[T]he plain error rule should not be invoked unless, but for the error, the outcome would clearly have been otherwise." *Id.*

{¶ 59} This court has previously held that "[a]n instruction under R.C. 2923.03(D) 'is not required when the witness is not charged with complicity as a result of involvement with the defendant's criminal activities.' " *State v. Olverson*, 2003-Ohio-1274, ¶ 54 (10th Dist.), quoting *State v. Sillett*, 2002-Ohio-2596, ¶ 14 (12th Dist.); *Jennings*, 2009-Ohio-6840 at ¶ 63 (10th Dist.). "Moreover, the possibility that a witness 'could' have been indicted as an accomplice does not require the court to instruct on accomplice testimony." *Jennings* at ¶ 66, citing *Sillett* at ¶ 19. Although G.H. was charged in juvenile court with tampering with evidence, G.H. was not accused to be a juvenile delinquent or indicted as

an accomplice to appellant. Thus, the trial court did not error, let alone plainly error, in refusing to give the requested jury instruction.

{¶ 60} Even if it could be said that the trial court erred in failing to give the requested instruction, the court's denial did not clearly affect the outcome of the trial. The jury was made well aware of the benefit G.H. received through his cooperation, both via G.H's testimony and the introduction of his proffer agreement into evidence. G.H. also admitted that he was less than truthful during his testimony. However, the jury found him to be credible, likely based on the fact that the other evidence tended to support his version of events. In fact, appellant benefitted from G.H.'s testimony because the jury acquitted him of the tampering with evidence charge.

{¶ 61} Furthermore, the jury instructions were not silent in regard to G.H.'s testimony. In its charge to the jury, the trial court stated:

> You have heard testimony from [G.H.], another person who has been adjudicated a delinquent minor of a similar crime charged in this case. The weight of [G.H.]'s testimony is for you to determine.
>
> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

(Tr. Vol. V at 715-716.) The court specifically mentioned that G.H. was charged and adjudicated delinquent based on his involvement in this case. It indicated that the jury may find his testimony to be not credible. Thus, the jury was well aware that there might be credibility issues with G.H.'s testimony. It follows that the court's refusal to use the instruction requested by appellant did not affect the outcome of the case.

{¶ 62} Based on the foregoing, we find that the trial court did not plainly error in refusing to give an accomplice testimony instruction to the jury. Appellant's third assignment of error is overruled.

**V. CONCLUSION**

{¶ 63} Having overruled each of appellant's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BOGGS and DINGUS, JJ., concur.

————————